## JOHN L. WILLIAMS v. KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant.

### In Banc, April 2, 1914.

1. **APPELLATE PRACTICE: Demurrer to Evidence.** Where defendant's only contention on appeal is that plaintiff did not make out a case on the facts for the jury, the soundness of that position must be measured by the stiff general rule that on demurrer a defendant's testimony, where contradicted, is taken as false, and a plaintiff's (where not self-evidently perjured or opposed to the physical facts) is taken as true. Contradictions between witnesses or self-contradictions, together with the credibility of the witnesses and the weight due their testimony, are all for the jury, not the court. The court must allow to a plaintiff's case on defendant's demurrer the benefit of every reasonable inference of fact arising on all the proof.

2. ———: ———: **Admission.** The party demurring admits the truth of the testimony to which he demurs, and also those conclusions of fact which a jury may fairly draw from that testimony. Forced and violent inferences he does not admit, but the testimony is taken most strongly against him, and such conclusions as a jury might justifiably draw, the court on appeal ought to draw.

3. **NEGLIGENCE: Responsibility.** It is not the present law that every one else is responsible for protecting one from injury except that one himself.

Williams v. Railroad.

4. ———: **Custom.** When a railroad employee undertakes to justify himself under a custom followed in running a train, his acts must be within the custom.

5. ———: **Contributory Negligence.** The doctrine of contributory negligence is still the law of this State, and can be exploded only by the lawmaker.

6. ———: ———: **Jumping Ahead of Moving Engine Without a Light.** An experienced brakeman, who, without any precaution or any visible concern for his own safety, springs of a dark night from the pilot of an engine attached to a moving train, intending the train to follow him as he runs several hundred feet ahead to turn a switch and sidetrack the train without its stopping (which is customary at the place), and without a light to see by, since his light has lately gone out, and without taking time to relight it or consult the engineer about stopping the train, but taking the chances of a slip, a misstep, a stumble, a fall, the most imminent danger of the most unpreventable injuries, and does fall and is run over by the train, is guilty of such contributory negligence as bars recovery for his injuries.

7. ———: ———: ———: **Demurrer to Evidence.** Plaintiff was an experienced brakeman, on an extra freight train north-bound which was required by the rules to sidetrack at a station to let a south-bound superior train pass on the main track. It had become customary as the train approached this station, to slow down and for the brakeman to jump from the train while it was still in motion, and run ahead and throw the switch, so the train could enter the sidetrack without stopping. That was done because the track was slightly up-grade, and if a heavy train stopped sometimes in starting again a drawhead to a car would be pulled out, causing loss of time, making necessary the flagging of the superior train which ran on schedule time, and the rules required a clearance within five minutes. The time was a very dark July night. Plaintiff was supplied with two lanterns, one with a red light for signals and the other with a white light to see by, and it was a brakeman's duty to fill, trim and look after his own lanterns. He was riding on the engine, on a seat provided on the east or fireman's side, a proper place for him to be. As the train, running from twenty to twenty-five miles per hour, was a mile or so south of the station, the engineer asked plaintiff to "get the switch" for him, and something was said about their being on "short time" for the superior train, and no directions or suggestions were given plaintiff about the character of the ground or the condition of the track, or where plaintiff should run, nor did he ask for any. Both understood that to "get

Williams v. Railroad.

the switch" meant to "run for the switch," to throw it, so that the train need not stop in passing onto the sidetrack. One cannot see from the engine's light the track for five or six feet immediately in front of the pilot. When the train was running three or four miles an hour and was two or three hundred feet from the switch, he left the engine cab, went out of the fireman's window, and by means of the running board reached the pilot, where the wind blew out his white light, which it is not claimed was defective. He then returned to the cab, and without relighting or attempting to relight the lantern, or telling the engineer of the incident, or asking advice, he gave the lantern to the fireman, and with only the red light went out the same window and by the same course to the pilot. His excuse for not relighting the lantern is that he thought he did not have time. When he reached the pilot he got on the engineer's (or west) side of it, where he was not and could not be seen by the engineer, and after riding there a little sprang out into the darkness on the east side of the center of the track, a distance of 150 feet or so from the switch. Not seeing him and the green light showing in the switch stand, indicating that the switch had not been thrown, the engineer inquired of the fireman if the plaintiff had gone ahead to get the switch, and on being told he had the train was stopped, the south-bound superior train was spied two miles up the track, and plaintiff was found sitting on the side of the track, one arm gone and both legs broken. *Held*, that, whether or not there was a hole or depression in the track into which plaintiff stumbled or fell, or whether or not if there was such a hole it had existed for such a time as would bring home notice of its existence to the company, and admitting that the company knew of the custom of "getting switches" by leaping from a moving train and running for them, the plaintiff was guilty of such contributory negligence as bars a recovery for his injuries, since, being an experienced brakeman, without any precaution for his safety, without using his red lantern, without any attempt to relight the white light, without asking advice from the engineer and without reporting to him that he had lost his seeing light and thus putting it up to him to stop the train because of that misadventure, and putting himself thoughtlessly outside the pale of human aid in case of a stumble or fall or any unknown defect in the track, he leaped into the darkness in the front of an imminent danger, without a light and the likelihood of seeing.

8. ———: ———: Two Dangerous Ways. The court refuses to consider whether the plaintiff is chargeable with choosing the more dangerous of two dangerous ways, to-wit, getting on the edge of the track instead of following its center.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield*, Judge.

REVERSED.

*Cyrus Crane* and *George J. Mersereau* for appellant.

(1) On the entire record plaintiff was not entitled to recover (a) Because of his own negligence; (b) Because of his assumption of the risk flowing from the manner in which he attempted to do the work. Gibbons v. Railroad, 66 Iowa, 231; Warmington v. Railroad, 46 Mo. App. 159; Loranger v. Railroad, 104 Mich. 80; Carrier v. Railroad, 61 Kan. 407; Francis v. Railroad, 110 Mo. 387; Estes v. Railroad, 37 Kan. 715; Fennell v. Railroad, 129 N. Y. 669; Thompson v. Railroad, 26 N. E. (Mass.) 825; Nickerson v. Railroad, 144 Mo. App. 410; Francis v. Railroad, 127 Mo. 658. (2) The evidence does not show that defendant was guilty of any negligence entitling plaintiff to recover. There was no duty devolving upon defendant to maintain a fully ballasted track at the point of the injury. 3 Elliott on Railroads, p. 607; 1 Labatt on Master and Servant, p. 174; 2 Bailey on Master and Servant, p. 998; Fennell v. Railroad, 129 N. Y. 669; Williams v. Railroad, 119 Mo. 316; Stid v. Railroad, 236 Mo. 407.

*Guthrie, Gamble & Street* and *A. F. Smith* for respondent.

(1) The jury are justified in the finding that the defendant knew of and acquiesced in the method of work as pursued by the plaintiff. Crawford v. Stockyards Co., 215 Mo. 394; Barry v. Railroad, 90 Mo. 62; Finnegan v. Railroad, 244 Mo. 608. (2) Defendant was bound to know that the track surface was used in running for switches. See cases under points 1 and 13. (3) The burden of care imposed upon the

defendant was not a heavy one.  (4)  The maintenance of the track as a footway as distinguished from a support for the ties and the rails.  Labatt on Master and Servant (1 Ed.), sec. 26, p. 63; 26 Cyc. 1149; Wilson v. Railroad, 122 Mo. App. 667; Railroad v. Merrill, 61 Kan. 671; Railroad v. Johnson, 95 Ill. App. 54; Richards v. Hays, 17 App. Div. 422, 45 N. Y. Supp. 234; Dunn v. Railroad, 107 Fed. 666; Miller v. Railroad, 17 Fed. 67; Wood v. Railroad, 144 Va. 650.  (5) The defendant owed due care toward the maintenance of the track in question.  Schumacher v. Breweries Co., 247 Mo. 141; Franklin v. Railroad, 37 Minn. 409; Railroad v. Sanders, 166 Ill. 270; Ford v. Railroad, 91 Iowa, 179; Lewis v. Railroad, 59 Mo. 495; Huhn v. Railroad, 92 Mo. 440; Hamilton v. Mining Co., 108 Mo. 364; Burdict v. Railroad, 123 Mo. 221; Hollenbeck v. Railroad, 141 Mo. 97; Railroad v. Robbins, 57 Ark. 377; Preston v. Railroad, 84 Ga. 588; Railroad v. Cozby, 174 Ill. 109; Railroad v. Morrissey, 177 Ill. 376; Railroad v. Schwartz, 58 Kan. 235; Hanna v. Railroad, 154 Mass. 529; Railroad v. Pinto, 60 Tex. 516; Railroad v. Reddicker, 67 Tex. 181; Kennedy v. Railroad, 43 Wis. 32; Southerland v. Railroad, 43 Fed. 646; Davidson v. Railroad, 44 Fed. 476; Railroad v. Mosely, 56 Fed. 1009; Railroad v. Teeter, 63 Fed. 527; Railroad v. Mugg, 132 Ind. 168; Sweat v. Railroad, 156 Mass. 284; Whitcher v. Railroad, 70 N. H. 242; Hennessey v. Railroad, 99 Wis. 109; Railroad v. Bunty, 152 Ind. 591. (6)  Plaintiff did not assume the risk of the master's negligence.  Dakan v. Mercantile Co., 197 Mo. 238; Obermeyer v. Chair Co., 229 Mo. 97.  (7) Plaintiff was not guilty of contributory negligence as a matter of law in being upon the track in front of a slowly moving train.  Francis v. Railroad, 127 Mo. 658; O'Mellia v. Railroad, 116 Mo. 205; Burdict v. Railroad, 123 Mo. 221; Hollenbeck v. Railroad, 141 Mo. 97; Preston v. Railroad, 84 Ga. 588; Railroad v. Cosby, 174 Ill. 109; Railroad v. Schwartz, 58 Kan. 235; Hanna v. Rail-

road, 154 Mass. 529; Railroad v. Pinto, 60 Tex. 516; Railroad v. Mudd, 133 Ind. 168; Hennessey v. Railroad, 99 Wis. 109. (8) Plaintiff was not guilty of contributory negligence as a matter of law in choosing the more dangerous of different ways open to him. Edington v. Railroad, 204 Mo. 67; Brady v. Railroad, 206 Mo. 509; Gordon v. Railroad, 222 Mo. 516; Richardson v. Railroad, 223 Mo. 325; George v. Railroad, 225 Mo. 403. (9) Upon the question of contributory negligence, the long established custom of doing the work in the manner in which it was done, was entitled to strong probative consideration by the jury upon the question of whether it was negligently done. Burdict v. Railroad, 123 Mo. 222; Hollenbeck v. Railroad, 141 Mo. 97; Brady v. Railroad, 206 Mo. 509; O'Mellia v. Railroad, 115 Mo. 205; Gordon v. Railroad, 222 Mo. 516. (10) A servant cannot be charged with contributory negligence in obeying an order, even though dangerous to attempt it, unless the danger was so glaring and obvious that a prudent man would not have chanced it. Pickett v. Railroad, 156 Mo. App. 272; Stevens v. Railroad, 86 Mo. 221; Stevens v. Railroad, 96 Mo. 207; Hurlbut v. Railroad, 130 Mo. 657; Doyle v. Railroad, 140 Mo. 1; Butts v. Construction Co., 199 Mo. 279; Buckner v. Horse & Mule Co., 221 Mo. 700. (11) This court has sustained innumerable cases where the injury was due to the master's negligence, where the danger incurred was much more glaring and obvious to the injured employee than in the case at bar. Hamman v. Coal & Coke Co., 156 Mo. 232; Charlton v. Railroad, 200 Mo. 413; Brady v. Railroad, 206 Mo. 509; Melly v. Railroad, 215 Mo. 567; George v. Railroad, 225 Mo. 364; Corby v. Telephone Co., 231 Mo. 417; Baker v. Railroad, 148 S. W. 611; Yost v. Railroad, 149 S. W. 577. (12) Plaintiff was not guilty of contributory negligence by reason of a violation of rule 519. Railroad v. Hunt, 73 S. E. 588. (13) Even if the terms of rule 519 could be applied to the facts

at bar, plaintiff was not guilty of contributory negligence in violating it because the defendant had waived it. It had long since become abrogated and dead. Even a clear and specific rule habitually and customarily violated with the knowledge and acquiescence of the employer is deemed to be waived. Knowledge and acquiescence may be presumd from long continued violation without complaint. Barry .v. Railroad, 98 Mo. 62; Rutledge v. Railroad, 123 Mo. 133; Francis v. Railroad, 127 Mo. 658; Yost v. Railroad, 245 Mo. 249; Howard v. Railroad, 110 Mo. App. 514; Duncan v. Railroad, 86 Kan. 112; Railroad v. Hunt, 73 S. W. (Ga.) 588; Railroad v. Hamerick, 96 N. E. (Ind.) 647; Wichert v. Railroad, 75 S. E. (N. C.) 812: Jones v. Railroad, 149 S. W. (Tex.) 372.

LAMM, C. J.—Plaintiff sued in the Jackson Circuit Court for $50,000 damages for personal injuries. Issue was joined on an amended petition. Presently plaintiff recovered judgment for $10,000, and defendant appealed.

A word on the pleadings will be helpful, thus: Plaintiff, a freight brakeman, complained in his petition that he was employed on one of defendant's freight trains that was through negligence so heavily loaded, operated on such schedule and run at such speed that it was necessary for him, in the due course of his employment, to alight from the engine of his train while in motion for the purpose of throwing a switch, etc.

(Note: The question whether the train was so negligently loaded, scheduled and run as to cause plaintiff to alight from it while in motion was not submitted to the jury as a ground of liability.)

The petition next charged that defendant "negligently maintained its track, roadbed and right of way at and near such point" (to-wit, a way-station, Drexel) "so that the same had holes and depressions therein and *was* [sic] not reasonably safe for the use

of its employees in passing over the same in the proper and required course of their employment as such;" that as the direct result of such negligent maintenance plaintiff, on getting off the train to turn a switch, fell and was injured. Negligent maintenance was the issue put to the jury as the ground of liability.

The answer was a general denial plus pleas of contributory negligence and assumption of risk.

The reply took issue on the new matter.

We allow ourselves a foreword, thus: There are record signs of a mistrial below. So, this cause, a difficult one, having been thoroughly argued twice by both sides, we believe, in Division and once in Banc; we are warned by respondent's veteran and able counsel as follows, to-wit: "There comes a time where patience ceases to be a virtue." There were signs beyond that admonition, both in briefs and in oral argument by respondent, showing that as "patience had ceased to be a virtue" *impatience* had taken her place and was relied on as one. Whether impatience is ever a virtue at the bar or on the bench of an appellate court is doubtful. The Chinese have a proverb running: Patience and the mulberry leaf become a silk gown; and there is high authority from no less a lawyer than Paul that: tribulation worketh patience; and patience, experience; and experience, hope; and hope, etc. Observe, all that category of related virtues is handy always and nowhere more so than to bench and bar.

In a strong brief respondent took the hazardous course of not making a plain, concise, colorless statement of fact and issues. The statement submitted carried the color of comment with almost every fact —comment argumentative in character and having no legitimate place in a statement of facts and issues. A fact stained with comment is an elusive and misleading thing. Accordingly, our brother who first wrote this case in Division was driven away from respond-

ent's statement because of the mischief of its fatal mixture of fact and comment with no marked line of cleavage between the two, and, as appellant's statement was apparently unchallenged, it was naturally accepted as a proper one. In doing so, we inadvertently fell into error and corrected it by granting a rehearing. Counsel differ so vehemently on the facts that we will discard both statements and from original sources, to-wit, the voluminous record supplemented by facts of which we take judicial notice, we will make one of our own, thus:

There is no assignment of error here on any question of pleading, none on any in the admission or exclusion of testimony and none on any on the giving or refusing of instructions on either side, save one, to-wit, the refusal of an instruction prayed by defendant in the nature of a demurrer to the evidence at the close of the whole case. Defendant demurred to the evidence at the close of plaintiff's case and again at the close of the whole case, and, in its motion for a new trial and in arrest and now in its briefs, it stands on the single blunt proposition, to-wit, that on the facts plaintiff made no case for the jury.

Attend to the facts.

Drexel is a way-station on defendant's line south of Kansas City at a point hard by where Cass county corners with Bates and the line dividing Missouri from Kansas. At the times in hand the United States census shows it was a village of between four and five hundred souls. There are estimates by witnesses higher than that. The south line of the village is a public east-and-west road cutting the railroad at right angles and running about one-fourth of a mile south of the station. Where this dirt road crosses the railroad there is the usual cattleguard and wingfence. Something less than a hundred feet north of this cattleguard, in the outskirts of the village, is a switch, and there a passing track commences. Save that passing

track, defendant's road runs north and south and con-
sists of one main stem. This passing track runs north-
wardly on the west side of the main track. This
switchstand has a switch light, showing red when the
switch is open for the siding and green when open
for the main track. This switchstand is on the west
side of the main track, so that, to a train going north,
the switchstand is on the fireman's side who rides on
the west or left-hand side of an engine north-bound,
as was the engine in question. South of this public
road defendant's track is in a field. We will recur in due
course to the lay of the land at Drexel. Plaintiff, when
hurt, must have been the rise of twenty-four years of
age (twenty-six at the time of the trial). He had com-
menced his railroading with the Santa Fe as a call
boy at the age of nineteen or twenty. He next was
a fireman on a switch engine in a Santa Fe yard. He
then was a yard switchman. He then fired a road en-
gine on the Santa Fe. For some act of "insubordina-
tion" he was discharged from that road and in April,
1907, he took service with defendant and was assigned
to duty in Pittsburg, Kansas, as an extra-freight brake-
man, running for four months mostly south from that
place (a division terminal point) when, now and then,
he was called to duty as an extra man, but he also ran
north through Drexel to Kansas City. The trip slips
kept by defendant show that prior to his injury he
made twenty-two trips north from Pittsburg to Kan-
sas City, as we understand it, during April, May, June
and up to July twenty-second in 1907. There is no
contradiction of these slips although plaintiff's recol-
lection varies in some instances from no trip that he
remembers up to several he recalls. As a switchman's
and a brakeman's duties overlap to some extent, we
may call plaintiff an experienced brakeman. There
were trains on defendant's road called "regular" or
"superior" freight trains—"carded" trains, sched-
uled and entitled to the right of way as against "in-

ferior'' or extra freight trains.   One of its superior
trains was numbered fifty-three and hence onward we
will call it train number fifty-three.   On a dark night,
about midnight of July 22, 1907, and on schedule time,
number fifty-three was south-bound loaded with mer-
chandise and due to leave Drexel at eleven-twenty-
five p. m., passing through without stopping.   At that
very same time plaintiff was approaching Drexel from
the south on an extra freight of twenty-three loaded
coal cars from Pittsburg, Kansas, bound for Kansas
City.   Plaintiff was riding on the engine on a seat
provided on the fireman's side, a proper place for
him to be.   His train crew consisted of a conductor,
riding in the caboose, a rear brakeman, an engineer
and a fireman.   By the rules of the company the con-
ductor had charge of the train, but the engineer was
also charged with responsibility, and the case may pro-
ceed on the theory that the evidence shows it was
proper for the head brakeman to take orders from the
engineer under the circumstances presently disclosed.
Coming into Drexel from the south is an up grade,
what per cent we are not informed.   But a train loaded
to its tonnage capacity labors some in reaching the
summit of the grade.   There being no evidence *contra*
we will assume plaintiff's train was loaded to rulable
capacity.   The switch spoken of is not at the summit
but south of it and we take it the grade vanishes some-
where between this switch and the station.

The main track is on a ''little curve,'' and there
is some slope from the west to the east, so that the
roadbed is a bit higher above the natural level of the
ground on the west than on the east.   We take it
from the record that on the west there is a little cut
and the usual drain.   The roadbed is what might be
called a dump, two, or three, or maybe four, feet
high and the rise of eight feet across from shoulder
to shoulder, the slope a gentle one.   The ties on this

dump are eight feet long and the track of the standard gauge, to-wit, four feet eight inches. We will recur to the condition of the track and sides again. If a train north-bound and loaded to its usual and rulable capacity stops on this grade it is more difficult to start than if the grade was level. Such trains do stop there and start without mishap, but sometimes one happens. If the train can start with the slack out, well and good, but if it has to back against set brakes so as to get the benefit of the slack in starting, sometimes the jerk in taking up the slack, or lost motion, pulls out a drawbar. When that happens not only delay occurs, but there is extra and disagreeable labor for the conductor and brakeman in making a chain coupling (a chain being carried in caboose or engine for such emergency), the train is damaged and a "report" is forthcoming. Because of the possibility of these incidents, in order to save time, damage and disagreeable work to the men, a custom or "practice" had grown up among defendant's freight brakemen in approaching the Drexel switch from the south (and elsewhere under like conditions) to "run for the switch" when their trains took siding there to clear for superior trains. We will recur to this custom later on. A run for a switch means that a head brakeman leaves the going engine, beats it to the switch and turns the latter so his train can take the siding without stopping. There was no rule of the company requiring this to be done. (Speaking of rules, we will recur to the subject-matter again.) The officer in the operating department next above the conductor was the train-master; above him, the superintendent. There was no evidence that defendant's train-masters or superintendents had actual notice of this custom, but it had existed for eight or twelve years, evidently to the actual knowledge of conductors and engineers, and the case proceeds upon the thory that it had existed for such time that notice to the company might be inferred.

To enable brakemen to leave a going engine, the motion of the train is slowed down to somethng like a fast walk, say, three or four miles per hour. On the night in question while his train was going from twenty to twenty-five miles per hour and was a mile or so south of Drexel, a conversation occurred between plaintiff and Mahan, the engineer. Plaintiff does not recollect the whole of this conversation, but there is no material difference between the part of it plaintiff recollects and the corresponding part of the engineer's testimony. The substance of it was that the engineer asked plaintiff to "get the Drexel switch" for him. There was something said about being on "short time" for number fifty-three. Plaintiff admits he knew of the cattle-guard, but says he knew nothing of track or side condition before his injury. The engineer says he cautioned him about the cattle-guard, told him there was a slat or so out next to the wingfence. Plaintiff does not deny what the engineer says. All sides agree that no directions or suggestions were given to plaintiff about the character of the ground or the condition of the track, or where he should run, nor did plaintiff ask for any. He assumed to know and act on his own judgment. He says he used his own "notion" and he furthermore admits that he knew from the time-card that his train would have to take the siding at Drexel to let fifty-three go by and that he would be expected to "get the switch" without this conversation with the engineer. This is the last the engineer saw of plaintiff until after the accident. Both the engineer and plaintiff understood that the meaning of the engineer's request was for plaintiff to "run for the switch," so that the train need not stop in passing on the siding to clear for number fifty-three. In switching in the night-time, a brakeman carries two lanterns furnished by the company, one a white lantern to see by and the other a red lantern to signal with. While signals are made when necessary on the fireman's side to be by

him caught and transmitted to the engineer, yet usually signals are given on the engineer's side. One can somewhat see where to step by a red lantern by putting it close to the ground, but its normal railroad function is to signal with and not to give light to see by. It was admitted on oral argument that the brakeman fills, trims and looks after his own lanterns. A company rule seems to require that they, as well as all "tools," be kept in safe and good condition. Plaintiff had two as above. He stayed on the fireman's side until the train approached the Drexel switch which showed at the time a green light indicating the main line was open. He then left the fireman's side of the engine cab, and instead of going down the gangway where steps are provided and usually used to get on and off of an engine, he took his own course and went out the fireman's cab window and by means of the running board there and a steam-chest, he got to the pilot on the fireman's side. A locomotive engine has a running board on either side. The pilot of an engine is the V-shaped "cowcatcher" of common knowledge. Where it commences it is about as wide as the engine. This part may be called the heel. It sloped from both sides to an angle in front and this angle may be called the toe or nose. At the heel there is a beam extending across from side to side. Along either side of the pilot's slope is a step a few inches wide and, say, two feet long about midway between the heel and the toe of the pilot. One standing on this step is not in the center of the track but is about half way between the center and the nearest rail. Plaintiff crossed on the pilot beam from the fireman's side to the engineer's side. Going back a little to another incident; when he first reached the pilot the wind blew his white light out. Why, does not appear. It is not claimed the lantern was defective or that there was a gale blowing in which a lantern light would not live. He then went back on the engine on the fireman's side and without relighting

or attempting to relight the white light or telling the engineer of the incident, or asking advice, he gave the white lantern to the fireman and went out the same window and by the same course along the engine to the pilot with only the red one. His excuse for not relighting the lantern was that he thought he didn't have time. Plaintiff's stature was small. He calls himself "awful short." At any rate, when he got on the engineer's side of the pilot, the engineer did not see him and we infer he could not see him. After riding there a little he got on the pilot step and then sprang out into the darkness on the east side of the middle of the track. As we read the record, the headlight on this engine was an oil lamp. There was testimony that the full force of the headlight strikes the track and spreads out some on either side, say, a hundred feet from an engine and some less distance than that, depending on the height of headlight. The sum of the testimony is that the headlight diffuses some light back of where its full force strikes and all agree that there is a space on the track right in front of the engine where the headlight gives no light at all. Ordinarily, if provided with lanterns, a brakeman getting off as this one did would in his run come within the line of vision of the engineer in, say, five feet or so in front of the toe or nose of the pilot, but on this occasion plaintiff did not come within the line of vision of the engineer at all. Not seeing him, and the green switch light still showing, presently the engineer inquired of the fireman if the brakeman had gone ahead to get the switch. On being informed he had, the train was stopped with the engine at a distance variously estimated at from a half car length to a greater distance from the switch. Number fifty-three was not then in sight. Presently its headlight was seen about two miles off and the fireman flagged it and brought it to a standstill. While the time was "short" we do not

get the idea there was any danger from fifty-three, or that the extra was off of its own or on fifty-three's time. The rules, however, required a clearance of five minutes. While this was taking place, by the use of a torch, the engineer found plaintiff sitting on the east side of the track opposite the middle of the third or fourth car back of the engine, and miserably hurt. His right arm was crushed off, both of his legs were broken (one a simple and the other a compound fracture attended in its history with surgical complications) and he was hurt in the head and had a wound, "a hole" he calls it, in his side. That he was saved from death was a miracle and it could only have been by the skin of his teeth. Details of his grave injuries, of his subsequent suffering, loss of time and permanent disablement are unimportant to any issue here; for the very good reason that defendant concedes that if plaintiff had a case to go to the jury, his judgment was well enough in amount (and so it was).

Did plaintiff get off in the center of the track or to the east of the center? Considering the danger of a misstep or fall, this is material. Plaintiff alone tells the story, for no eye saw him. The record is confusing because it contains plaintiff's testimony delivered on three separate occasions: once by deposition, once at a mistrial and again at the trial, and he does not always use the same words. But putting all he said at each time he spoke side by side it is clear he got off, and means to say he got off, between the center and the east rail. He says so repeatedly. He stood on a step on the east side of the pilot about over a point half way between the center and the east rail. So standing, he sprang quickly "straight ahead." There is nothing to show he could have reached the center if he had tried. Once or twice he used the word "center" or "middle" in the sense of the entire space between the rails, and without giving all his testimony we copy this as a fair summary and meaning of it:

"Q. You mean the middle of what would be the center of the track and the east rail? A. Yes, sir. . . . You don't exactly step in the center of track, you step over like this, right near the east rail, you don't step right in the center." And again: "Q. And this step you are talking about, runs about half way from the heel of the pilot to the nose? A. Yes, sir. Q. On both the engineer's and fireman's side? A. Yes, sir. Q. Now how can you step from that into the center of the track? A. You don't exactly step in the center of the track, you step over like this, right near the east rail—you don't step right in the center. Q. Then this step on both sides of the pilot is about over the rail isn't it? A. Not all of it; one end of it about strikes the rail. Q. The outer end would be over the rail? A. Yes."

Let us recur to what plaintiff did and how he did it. He says he sprang off straight ahead on the east side of the pilot quickly as if in a run or preparatory to a run. His first step was on an even surface. He did not know whether it was a tie or on the ground. He then claims to have taken either one, two, three or four steps. He puts it differently at different places in his testimony; some places he says "two, three or four," then he says "somewhere along" one or two, but the sum of it all is as we have said. His evidence is to be taken with the steady and guiding fact that before he fell he did not get five feet beyond the nose of the engine and in the line of the engineer's vision. For all practical purposes, he fell at once. When he stood on the pilot step he had not made any use of his red lantern to spy out the ground ahead between the rails or on either side of the rails. He says he knew nothing about such conditions and made no attempt to ascertain. When he fell he stepped in what he calls in some places a "hole" and elsewhere a "depression." He explains that to be a place between the ties where the ballast was 'out. His impression is

that this depression was three or four inches deep. That impression arose solely from his sensation in the darkness of going down beyond the level of his first step. There was no testimony that he was able (by practice, or experience) to judge of *depth in inches* by such sensation in the dark. (Note: Who could? It is common knowledge that an *unexpected* inch or even less, in a change of level, works havoc with the equilibrium.) When he fell his impression is he tried to get up, but one of his legs failed him by reason of the fall. In what way the fall impaired the use of the leg is not described, but at once the engine was on him, and then the engine (forty-five feet long, including the tender, and either two cars and a half of say thirty-five feet each, or three cars and a half) passed over him. He remembers to have caught the brake-beam of the engine with one hand. He says at one place that he was no judge of distances even when cool and he had the use of his eye, but he thinks he was dragged eight or ten feet. His hold on the brake-beam was lost, the ashpan of the engine rolled him, "several things struck him," he never lost consciousness, but tried to scramble out. Just when his arm was ground off, or his legs broken, or his side was wounded so there was a hole in it, or his head injured, he does not know, and we might fairly say that in the dreadful flurry of such dilemma he would not likely know how far he was dragged or rolled or scrambled or was pushed, or just when or how he came by his injuries. The law (which is reason) would not require that at his hands. Presently the train stopped and then he succeeded in crawling out, a thing he had tried to do several times but could not before. We may as well at this point state that the record shows that next morning the track was examined and measurements taken by defendant that remain substantially uncontradicted. It was found from the blood on the ties and on the rails, including where the bloody marks

commenced and where they ended at a pool of blood where he sat after getting from under the car, and including also the disturbances of the surface of the ground on the track and of a pile of engine ashes on the track, that he was dragged, rolled or shoved considerably the rise of one hundred feet and this agrees with the probable spot he would likely get off to make a run for the switch and beat an engine thereto moving at three or four miles per hour.

Up to this point in this statement there has been no mention of holes or depressions in the track except as derived from the sensation of plaintiff in stepping into one in the darkness. His case in this particular was fortified, if at all, by the testimony of the fireman of train number fifty-three, a Mr. Scott. Whether Scott had a torch or saw by the light of one held by someone else is not disclosed. We infer from what he says later on that he had no light and looked no farther than under the one car. He says when his own train stopped he went to plaintiff. He found him about the middle of the third car back of the engine of the extra freight, sitting outside the rail. When asked if he examined the track near where Mr. Williams was, he replied: "Well I didn't make no special look, or anything like that. *I remember looking under the car.*" When asked what the condition of the track was to the extent he did observe it, he replied: "The track didn't look very good below where he was sitting." This was objected to and stricken out. Then the record shows this:

"Q. South of where he was? A. South of where he was sitting? A few holes down there. Q. What do you mean by a few holes down there? A. Holes in the middle of the track. O. Well, what sort of holes? A. Oh, there was supposed to be ballast. Q. You mean the ballast didn't come up level with the ties, or above it? A. Yes, sir. Q. How was the surface of the track between the rails otherwise along there,

except for these holes? A. Well, it was part of it that was ballasted above the ties. Q. You may state whether or not in locations like that, on a track approaching stations, the ballast is usually up level or with the ties? A. I don't know hardly how I would answer that question. Some places it's ballast and some places it isn't. . . . Q. What were the conditions that night, as to light or darkness? A. It was awful dark; couldn't see very far ahead of you. Q. About how far ahead could you see without a light? A. Four or five feet.''

There was evidence that at the place in question the surface of defendant's roadbed between the rails was of gravel, chat, cinders and dirt. The center (as was usual) was higher than either side, for drainage purposes. In the center it was not always exactly even. Sometimes the surfacing would be a half inch or an inch higher than the tie and sometimes the same below the tie. It ran in that respect about like the main track, and, as we understand it, about like the track did elsewhere in like locations relative to switches at small way-stations. The track being higher in the center, the ties would naturally become more prominent as one from right or left approaches the rail from the center. While this testimony was introduced on behalf of defendant we see no substantial contradiction of it and no impeachment of the witnesses by cross-examination or otherwise. The record shows, also, without substantial contradiction that at the place plaintiff got off there was nothing to prevent his running for the switch on either side of the track and outside of the end of the ties. The shoulder and slope of the small dump were not in the way of use by a footman. There were no weeds, loose ties or other obstruction in the way. In fact there is unimpeached testimony that there was a little footway on the west side presumably made and used by brakemen, and some of the testimony shows there was one of like

sort on the east side also. No holes or depressions in the center of the track were found on their examination of three or four inches in depth, or otherwise than as already indicated.

Recurring to the custom of running for the switch, the sum of it all was that the head brakeman, acting on his own judgment, either left the pilot or went down the steps from the gangway on the side of the engine. The usage, by the run of brakeman, was to do it about as much one way as the other taken as a whole. We give our estimate of it, not unmindful of the fact that a witness or so gave it as the result of his observation that the usual way was to step off the pilot. On this occasion plaintiff, who says that under like circumstances when making a run for a switch he always got off the pilot, disclaims (at least at one place in his testimony) any knowledge of ever having thrown this identical switch in a run north, and at another place explains why he used the pilot step instead of the gangway, thus:

"Q. Why didn't you get down off of the step at the side of the engine instead of off of the pilot? A. Well, I thought I was running just as much chance getting off there as any place. Q. Why? A. Because I was liable to the suction and might slip down or back under the engine, and if I get off there I have the engine's speed to overcome. I might run into a tie or a lump of coal or something like that and throw me."

*There was not a particle of testimony that any brakeman in making a run for a switch in the night-time at this point, or at any other on the road, ever made it without a white lantern to see by, whether it was made on the track or to either side. No such custom was shown.* There was uncontradicted testimony to the effect that plaintiff, if he chose so to do, could have declined to run for the switch, and could have insisted on the train stopping.

There were some rules of defendant read into the record on both sides, thus:

"89. At meeting points between trains of different classes the inferior train must take the siding and clear the superior train at least five minutes, and must pull into the siding when practicable. If necessary to back in the train must first be protected as prescribed by Rule 99, unless otherwise provided.

"9. When a train stops or is delayed, under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled he may return to his train, first placing two torpedoes on the rail when the conditions require it.

"105. *Movement of Trains.* Both conductors and enginemen are responsible for the safety of their trains and, under conditions not provided for by the rules must take every precaution for their protection.

"303. *Trainmasters.* They must enforce the tonnage rating for freight trains, and must see that the movements of all trains are made without unnecessary delay.

"500. Reports must be made to the proper officers of any event detrimental to the interest of the company.

"In case of accident to trains, injury to persons, or the existence of anything which may imperil the safety of the service, information must be given at once, to be followed by report giving full particulars.

"Violation of rules or special instructions must also be reported.

"519. Employees of every grade are warned to see for themselves, before using them, that the machinery or tools which they are expected to use are in proper condition for the service required; and if not, to put them in proper condition, or see that they are so put, before using them; or secure other tools that

are in proper condition in their stead. The company does not wish, or expect its employees to incur any risks whatever from which, by exercise of their own judgment and by personal care, they can protect themselves, but enjoins them to take time in all cases to do their duty in safety, whether they may, at the time, be acting under orders of their superiors or otherwise.

"716. *Freight Service.* They must see that their trains are filled out to the required tonnage.

"823. Freight brakemen will report to and receive instructions from the trainsmaster. When on duty they must obey the orders of the conductor."

"901. *Enginemen.* They are jointly responsible with the conductor for the safety of the train and the proper observance of the rules; and, although they are under the directions of the conductor with regard to the management of trains, they will not comply with any instructions which imperil the safety of the train or involve a violation of the rules.

"922. They must exercise caution and good judgment in moving and coupling cars and in starting trains to avoid all violent or sudden movements which might cause discomfort or annoyance to passengers, or damage to property.

"When handling trains carrying live stock, they must be careful to avoid shocks that will be likely to throw the animals off their feet."

Some complaint is made by respondent of the position taken by appellant at the trial on the admission of testimony. Significance is sought to be attached to that in connection with certain positions taken by appellant's counsel in their briefs; but we find that respondent's learned counsel tried their case with abundant caution in that regard and when an objection was made in the particulars in hand, he would withdraw the question. For example, he asked of a witness why they (brakemen) usually take the center of the track?

On objection that it called for the conclusion or opinion of the witness, the question was at once withdrawn. He returned to the question more than once and on the same objection withdrew it again *sua sponte*. He attempted to show that there were other places besides Drexel where the same conditions existed and where the same custom was in vogue of running for a switch. On objection he withdrew that question before the court spoke. (But there was such evidence finally let in.) He undertook to show that within the observation of a witness track materials were piled by the company and left on the ground beside the track, the question not being directed to the place in question, but being a general one. On objection made, counsel said: ''I won't press the question.'' Other instances might be given, where questions were withdrawn without allowing the court to pass upon the objection. On such record, we will put away from us the contention that the position of defendant's counsel is weakened because of objections to such offered evidence.

The petition counts on not only a negligently maintained ''track and road bed'' but a negligently maintained ''right of way near said point so that the same had some holes and depressions therein . . . not reasonably safe,'' etc.

There was no attempt to prove a cause of action on the charge relating to the right of way, if by ''right of way'' is meant the company's territory on either side of the track, nor was the case put to the jury on such theory.

The evidence such as it is on the existence of a hole in the track has been mentioned and we now come to the question of notice to defendant. There was no evidence of notice whatever and none tending to show for what length of time it existed, if it did exist. There was testimony to the general fact that rain washed ballast away and that the passage of trains settled it. This was as far as the evidence went. Other causes

were not exploited, save that in track construction generally there is more exposure of ties (holes?) as one approaches the rails from the track center.

One thing more on the record: Plaintiff's counsel in one of their briefs urge as an excuse for their client's lack of care, that (quoting):

"The same disregard of the company for the interests of their men where the interests of the company in expedition of business were concerned that caused it to so load its trains that this custom of running for the switch became necessary, had brought Williams to a physical and mental condition where he was in no condition to exercise due care for his own safety by good judgment or other than by mere instinct. The defendant had worked him *for more than twenty-four hours without rest or sleep,*" etc." (Italics, counsel's.)

That statement of fact was sharply challenged by defendant's reply brief and counsel in a later brief with commendable frankness confess error in that particular. The record shows plaintiff had ample rest and was called to duty on the evening of the same night he was injured. Nor, we add, is there any record tending to show negligence in loading the train, nor was such issue (as already pointed out) put to the jury.

In making this statement we have purposely made it uncommonly full. We (barring a reprint of the entire record) have adopted the alternative of giving our own estimate of the fair substance of the evidence on points deemed material to an application of the law to the facts, and plaintiff's case must stand or fall on that application to those facts.

On such record, a majority of this court direct me to say that in their opinion plaintiff's judgment cannot stand, because:

(a) As defendant carries all its eggs in the one basket, to-wit, that plaintiff did not make a case on the

facts for the jury, it follows that the soundness of that position must be measured by the stiff general rule that on demurrer a defendant's testimony (where contradicted) is taken as false; a plaintiff's (where not self-evidently perjured or opposed to the physics of the case) is taken as true. Contradictions between witnesses or self-contradictions by a witness, together with the credibility of witnesses and the weight due their testimony, are for the jury, not the court. So it is for the jury to reconcile differences and iron out the wrinkles of vagueness or discrepancy, if any. So, the court must allow to a plaintiff's case on defendant's demurrer the benefit of every reasonable inference of fact arising on all the proof. [Fritz v. Railroad, 243 Mo. l. c. 77; Stauffer v. Railroad, 243 Mo. l. c. 316.] "The party demurring admits the truth of the testimony to which he demurs, and also those conclusions of fact which a jury may fairly draw from that testimony. *Forced and violent inferences he does not admit*," (italics are ours) "but the testimony is to be taken most strongly against him, and such conclusions as a jury might justifiably draw the court ought to draw." [*Per* MARSHALL, C. J., in Pawling v. U. S., 4 Cranch, 219; Pleasants v. Fant, 89 U. S. l. c. 121.] It is in the light of such guiding rule defendant's demurrer must be ruled, not otherwise.

*(margin note: Demurrer to Evidence.)*

(b) Was plaintiff guilty of such contributory negligence as barred recovery? We think he was. Without a particle of precaution or any visible concern for his own safety he, an experienced brakeman, sprang on the track ahead of a moving engine (intending it to follow him as he ran several hundred feet) in the darkness of night without a light to see by, taking his chances of a slip, a misstep, a stumble, a fall, probable death therefrom, or (at the very least) the imminent danger of the most grievous and *unpreventable* injuries. Ob-

*(margin note: Contributory Negligence.)*

serve, he did not even use the little light he had to spy out the ground. He asked no advice and did not report to the engineer that he had lost his seeing light and thus put it up to him to stop the train because of that misadventure. He did not attempt to relight his light, but thoughtlessly put himself outside the pale of human aid in case of disaster in his run, knowing nothing of the way and seeking no information. If he had blindfolded himself and had sprung off the nose of that engine, he would not have put himself in a worse predicament voluntarily. His only excuse was that he "didn't think he had time to relight his light." Mark, he didn't counsel with the engineer on that pregnant fact. We shall take judicial notice of the value of a light to the human eye in the night time in running along an unknown runway. A brother suggests that Diogenes used a lantern in the day time, but that was on a special quest, to-wit, to find an honest man, and the precedent is without weight. Matt. xxv, 2 to 10 is more in point. Speculative fancies on whether a man with a lantern could or likely would see a hole in the track four inches deep and of a size to take in a foot are of no value in getting at the truth of it. The light itself was the test. As a bird in hand is worth two in the bush, so an ounce of fact is worth a pound of conjecture. We think, too, that the whole situation must be judged from the standpoint that if time failed him, then, in all reasonable probability, there could no worse happen than a possible broken drawbar; for, observe, running for the switch necessarily involved the proposition that the engineer would stop without a lantern signal, as he did in fact do, and because of the green switch light, before his engine reached the point of the switch. The fact was that the train stopped and started without difficulty or broken drawbar. The fact was that the other train was over two miles off and, with ample provisions for flagging and warned of its necessity (as would be the case in that event)

it was a vain fear to anticipate a collision.  And what says the maxim?  *Vani timoris justa excusatio non est.*  We can not very well write the law to be that, under such facts plaintiff had the right to shift over on the shoulders of defendant the sole responsibility for such negligent conduct—such a leap in the dark. It is not the present law that everyone else is responsible for protecting one from injury *except that one himself.*

Let it be conceded to plaintiff that the dangerous custom had grown up of running down the track for a switch in the nighttime from the nose of a going locomotive.  Let it be admitted that the custom had existed so long, and was so uniform, that defendant's notice of the custom might be inferred from the flux of time, yet there is not a shred of testimony tending to show that this custom involved *running in the darkness without a light to see by.*  Plaintiff was outside the custom as proved, and we know of no principle of law that would relieve him from responsibility for his contributory negligence in doing that thing.  It is self-evident that when one justifies under a custom, his acts must be within the custom.  He must not pour new wine in an old bottle.

Cases may be found where a party has negligently put himself in peril and afterwards the master, through some act of negligence, has injured him and where recovery has been allowed.  But such cases are not this case and we are cited by plaintiff's counsel to neither a controlling nor persuasive precedent involving the facts we are dealing with here where recovery was allowed.

We know very well that the proposition is abroad in the land that the doctrine of contributory negligence should be exploded.  We know, too, that that proposition is being hammered out on the anvil of public discussion and in some other jurisdictions has been crystallized into written law.  We take it that if

a new and refined sense of social justice ever requires that, in the first instance, the carrier pay remunerative damages for an injury although the servant contributes thereto by his own negligence (or even when the master is not negligent) and in the second instance that the loss should be shifted by distribution over on the general public, as it would be under known and immutable economic principles, then, the same new and refined sense of social justice will require that means of payment through a proper adjustment of rates for freight and passenger carriage be provided at the same stroke. But this is by the way. We are not now called upon to write the law under such circumstances; for that would be writing it as it is not and not as it is.

If, as maintained by some publicists, the defense of contributory negligence be an evil in the law; if the multiplicity of squabbles that arise over the application of the alleged refinements of that doctrine be defects calling for a cure by striking at the root of the matter, not cured one at a time as mosquitoes were once killed (we borrow the similitude), but slapdash in saltatory fashion and by wholesale, as science now teaches, then we must bide the time the lawmaker first speaks in that behalf and so writes it down.

There is another phase of the question of contributory negligence insisted on by defendant's counsel, to-wit, negligence as a matter of law in choosing the way self-evidently most dangerous of two presented to him in making his run. As the case has already broken, we leave the point to be decided, if ever, in some case turning on it as a pivot. Ultimately and on final analysis it involves the question whether the carrier must make *two* ways safe for running in the night time with or without a light, namely, one *on* the track, the other *beside* the track. It also involves the question whether, if the carrier (we will say by a rule) requires the servant to run ahead of a going engine

in the night time with or without a light, such a rule would stand the test of reason as a humane regulation. Would disobedience to such an abominable rule defeat recovery? It also involves the question of the danger from "suction" by a train going at the rate of speed of a fast walk and others referred to by plaintiff as determining his choice of a runway. But we leave those questions to be answered when they are here to be ruled as matter of necessary substance, and not, as here, where the case has broken.

Nor, by the same token, is it necessary for us to decide the question most learnedly and elaborately discussed by counsel, to-wit, the question of defendant's negligence in track maintenance at the place in question, as a matter of law on the facts in judgment, a negligence stubbornly denied. With that conclusion we put away from us the further questions whether, first, there was substantial evidence of a negligent hole or depression, and, second, more important still, whether there was any substantial evidence tending to show that such hole or depression, if any, had existed such length of time as would bring home notice to defendant. We say *substantial* evidence, because the "scintilla" doctrine is no longer the rule in this jurisdiction. It is exploded here as it is in England (Ryder v. Wombwell, L. R. 1870, 4 Ex. 31) and as it is as a Federal doctrine (Pleasants v. Fant, 89 U. S. 116).

Unless that sympathy for this unhappy man, which we admit, be allowed to press our judgment beyond the utmost known fringe of the law, as declared in this jurisdiction, it must be held that error was committed in refusing defendant's demurrer.

With that conclusion reached, there is nothing left to do except to pronounce the judgment we now do, to-wit, the judgment must be reversed. It is so ordered. *Graves, Walker* and *Faris, JJ.,* concur; *Brown* and *Bond, JJ.,* dissent. *Woodson, J.,* does not sit.