HAZEL ROSELLA LORTON, Administratrix of Estate of FOUNT H. LORTON, v. MISSOURI PACIFIC RAILROAD COMPANY, Appellant.

### Division One, December 19, 1924.

1. **NEGLIGENCE: Safety Appliance Act: Employers' Liability Act: Defective Coupler: Injury in Line of Duty.** The Federal Safety Appliance Act makes it unlawful for a railroad company to haul or permit to be used on its line any car not equipped with couplers coupling automatically, and the Federal Employers' Liability Act makes the railroad company liable where a violation of the Safety Act contributed to the injury or death of an employee; and in an action based on both acts, the plaintiff makes out a case for the jury by substantial evidence showing that the coupler was defective and would not couple automatically, and that the deceased switchman, in the line of his duty, went in between the cars for the purpose of inspecting and adjusting the defective coupler, and that, while doing so, the engineer, in response to the signal of the foreman of the switching crew, pushed forward other cars and crushed him. In such case contributory negligence is not a defense, and unless the switchman's own conduct was the sole or proximate cause of his injury plaintiff is entitled to recover, and it cannot be ruled that his own conduct was the proximate cause where the evidence establishes that he was in the line of his duty when he went between the cars to adjust the defective coupler, for then his presence between the cars was the immediate cause of his injury, and that presence was induced by the defective coupler, which, therefore, was the proximate cause.

2. ————: **Incompetent Evidence.** An assignment in appellant's brief that the trial court admitted incompetent, irrelevant and immaterial evidence amounts to nothing, where the evidence complained of is not pointed out and the record reveals no objection to the admission of any evidence offered by respondent.

3. ———: Instruction: **Defective Coupler: Injury in Line of Duty.** In an action for damages based on the Federal Safety Appliance Act and the Federal Employers' Liability Act, an instruction telling the jury that if they find that the switchman, after the parting or separation of the cars, "in the line of his duty as a switchman, went in between the ends of the two cars where they had separated, for the purpose of adjusting or making operative, or attempting to adjust or make operative for coupling, such broken, defective or operative coupler," etc., is not erroneous, where there is ample evidence to support it.

4. ———: ———: **Measure of Damages: Mortality Tables: Pecuniary Loss.** Notwithstanding annuity or present-worth tables do not constitute an absolute guide of the judgment and conscience of the jury and they are not bound to follow and accept the computations or values shown by them, such standard life or annuity tables are evidence upon which the jury may base a finding of the present cash value of the pecuniary benefits of which the wife and minor children of the deceased switchman were deprived by his death; and where a mortality table was by agreement read in evidence and it showed that the life expectancy of deceased was 32.5 years and that his wife's life expectancy was 38.12 years; and there was evidence that he was 34 years of age; that his earnings had been $185 per month, of which he retained $35 and gave to his wife the balance for family expenses; that he left surviving him two children, aged two and four years, respectively, it cannot be ruled that there was no evidence upon which the jury could determine the present cash value of the pecuniary benefits of which the wife and children were deprived.

5. ———: **Excessive Verdict: Twenty Thousand Dollars.** The plaintiff sues as administratrix, under the Federal Employers' Liability Act for loss sustained by her, aged 26 years, and her two daughters, aged two and four years respectively, when her husband and their father, aged 34 years, was killed by defendant railroad company. He was ablebodied, strong and in perfect health; his earnings were $185 per month, and of this amount he allowed himself $35 per month, and the balance was used by her for the support of the family; his life expectancy was 32.5 years, and his wife's 38.12 years. *Held*, that a verdict for twenty thousand dollars does not indicate passion and prejudice on the part of the jury, and cannot be held to be excessive.

Citations to Headnotes: 1, Master and Servant, 26 Cyc. 1124, 1230, 1461, 1483; 2, Appeal and Error, 3 C. J. par. 1519, and 4 C. J. par. 1659; 3, Master and Servant, 26 Cyc. 1492; 4 and 5, Death, 17 C. J. pars. 183, 235.

Appeal from St. Louis City Circuit Court.—*Hon. Victor H. Falkenhainer*, Judge.

AFFIRMED.

*Edward J. White, James F. Green* and *Merritt U. Hayden* for appellant.

(1) This suit is based upon an alleged violation of the Act of Congress known as the Safety Appliance Act (27 Stat. L. 531). The burden was imposed, by law, upon respondent to prove not only that appellant violated this act, but that the condition which resulted from such violation was the proximate cause of the death of her intestate. Railroad v. Conarty, 238 U. S. 243; Railroad v. Layton, 243 U. S. 617; Lang v. Railroad Co., 255 U. S. 455; Davis v. Wolfe, 263 U. S. 239; Railway Co.. v. Eisenhart, 280 Fed. 271; McCalmont v. Railroad, 283 Fed. 736; Warner v. Ry. Co., 178 Mo. 125; Swearingen v. Railroad, 221 Mo. 644. (2) The defective coupler on the car was not the proximate cause of the injuries which resulted in the death of respondent's intestate. Its condition at the time of, and immediately prior to, the accident did not necessitate any action on the part of deceased which required him to be around, or in the vicinity of, the coupler, or in any danger of injury as the cars came together, and he was not in the performance of any duty for appellant when he went into or while he remained in danger between the cars. There is a failure of proof of any reason for his going in between the cars. His duties required him to be elsewhere than between these cars or near enough to the defective coupler to be in any danger of injury from the cars coming together. The evidence offered by respondent tends to establish that this coupler was not only inoperative, but could not be made operative for coupling by Lorton, and there is no evidence that it was a part of his duties to repair this coupler. Railroad v. Conarty, 238 U. S. 243; Railroad v. Layton, 243 U. S. 617; Lang v. Railroad, 255

U. S. 455; Davis v. Wolfe, 263 U. S. 239; Ry. Co. v. Eisenhart, 280 Fed. 271; McCalmont v. Railroad, 283 Fed. 736. (3) The negligence of Lorton was the independent, intervening, efficient and sole cause of the injuries which resulted in his death. Railroad v. Conarty, 238 U. S. 243; Railway v. Wiles, 240 U S. 444. (4) There was no evidence upon which to base a finding by the jury of the "present cash value of the future pecuniary benefit" of which either the respondent or her children are deprived by the death of Lorton. nor is there any evidence from which the jury could make "adequate allowance for the earning power of money." The instruction afforded no guide whatever for the assistance of the jury in arriving at the amount of its verdict. Railway Co. v. Kelly, 241 U. S. 485. (5) The verdict is excessive. Midwest Bank & Trust Co. v. Davis, 233 S. W. 406.

*Mark D. Eagleton* for respondent.

(1) Lorton's duty required him to go between the ends of the cars which had separated by reason of a defective coupler. In using this coupler the railroad company violated the terms and provisions of the Safety Appliance Act. Railroad v. Layton, 243 U. S. 617.; Davis etc. v. Wolfe, 263 U. S. 239; Texas & Pac. Ry. Co. v. Rigsby, 241 U. S. 33. (2) The pleadings did not charge Lorton with negligence. There was no evidence of same. Contributory negligence is not even a defense in diminution of damages where there is a violation of the terms of the Safety Appliance Act. Grand Trunk Ry. Co. v. Lindsay, 233 U. S. 42. (3) Plaintiff's instruction on the measure of damages followed the language of the Supreme Court of the United States in Railway v. Kelly, 241 U. S. 485. (4) The verdict is not excessive. Lorton left surviving him a young wife and. two small children. The evidence showed his regular earnings were $185 per month, and these earnings were not made during a period of time when wages were abnormally high. Bank v.

Davis, 233 S. W. 406; Laughlin v. Railway, 275 Mo. 471; Crecelius v. Railroad, 284 Mo. 26; McIntyre v. Railway, 227 S. W. 1047; Southern Ry. v. Bennett, 233 U. S. 80; So. Pac. Ry. v. Vaughn, 165 S. W. 885; Antcnio Ry. v. Littleton, 180 S. W. 1194; Gulf Ry. v Beezley, 153 S. W. 1171; M. K. & T. Ry. v. Williams, 117 S. W. 1043; Antonio Ry. v. Williams, 158 S. W. 1171.

SEDDON, C.—This is an action by plaintiff, as administratrix of the estate of her deceased husband, Fount H. Lorton, for the benefit of herself and her two infant children, to recover damages for his death under the Federal Employers' Liability Act (U. S. Comp. Stat. 1918, secs. 8657-8665) and Section 2 of the Safety Appliance Act (U. S. Comp. Stat. 1918, sec. 8606).

The petition, in addition to other specific acts of negligence pleaded, alleges that deceased, on November 20, 1921, was in the employ of defendant as a switchman and was engaged in his duties for defendant in its railroad yards in St. Louis, Missouri, with a switching engine and crew, in moving and switching cars in interstate commerce, and while deceased was necessarily between two such railroad cars, for the purpose of adjusting or fixing the coupling device thereof, he was crushed and fatally injured between them, as a direct and proximate result of defendant's negligence, and that by reason of defects and insufficiency, due to defendant's negligence, in its cars, appliances and equipment, and its violation of the provisions of the aforesaid laws of the United States, in that said car was not equipped with couplers coupling automatically by impact, or which could be uncoupled without the necessity of men going between the ends of said cars, the deceased was necessarily required to and did go between said cars and was injured, and as a direct and proximate result of defendant's negligence and the violation of said laws he received the injuries which resulted in his death.

Defendant's answer was a general denial.

306 Mo.—9

The trial resulted in a verdict for plaintiff in the sum of $20,000, and from the judgment thereon defendant has appealed to this court.

Plaintiff's intestate, Fount H. Lorton, was fatally injured ,while in defendant's employ as a switchman, about six o'clock in the evening of November 20, 1921, after dark. He was injured in the Eighteenth Street railroad yards of defendant, which consist of a number of tracks, extending in an easterly and westerly direction from Eighteenth Street on the east to Twenty-first Street on the west. The tracks curve somewhat to the south as they extend toward the west. Deceased was a member of a switching crew consisting of a foreman, Martin, and four switchmen, Lorton, Gregg, Linton and McKee. The switch engine was manned by engineer Harris and fireman Hoops. The other members of the crew were two switch-tenders, Bowers and Walsh. Five members of the crew testified as witnesses at the trial. Switchmen Gregg and Linton and the engine fireman, Hoops, appeared as witnesses for plaintiff. The engineer, Harris, and the crew foreman, Martin, appeared as witnesses for defendant.

A freight train, consisting of some nineteen or twenty cars, had come in off the road and had been left standing on one of the tracks in the yards. Several of the switching crew, including Lorton, the deceased, rode up on the foot board of the switch engine to Twenty-first Street, and the engine headed in on the west end of the track and coupled onto the west end of this string or train of cars. The switch engine was headed east, so that the engineer was on the south or right-hand side of the engine. After the engine had coupled onto the train, it started to shove the train of cars down the track toward the east. The switching movement was being made on Track Number 11. The crew distributed themselves along the train. The deceased, Lorton, was known as the head man, and his regular or usual position was next to or near the engine, and he took a position on top of either the next or the second car from the engine. The

foreman, Martin, assumed a position near the east end of the train, close to Eighteenth Street, while switchmen Gregg and McKee were located somewhere east of Martin. Switchman Linton took a position near Martin, just east of the Eighteenth Street viaduct.. It appears to have been a duty of Lorton, as head man, to pass the signals from the foreman and the other switchmen along to the engineer. In other words, as expressed by one witness, ''he is the last man to give the signal'' to the engineer. The signals on this particular switching movement were given either from the top of the train or on the south side, or engineer's side, of the train. It being dark, the signals were given by lighted lanterns. After the engine had pushed the train a short distance toward the east, the engineer received a stop signal, given, as he testified, by Lorton from the top of the box car next to the engine. Upon stopping the engine, a separation of the train occurred about five or six cars from the engine. Thirteen or fourteen cars on the east end of the train drifted to the east along the track, while five or six cars attached to the engine on the west end remained standing still on the track. Some of the crew appear to have immediately realized, or thought, that a separation or parting of the train had occurred. Switchmen Gregg and McKee, who were with the east end of the train, boarded the drifting section and brought it to a stop. When the separation occurred, switchman Linton and foreman Martin were together just east of the Eighteenth Street viaduct, about two car-lengths west of the extreme east end of the cut of cars. Thinking the train had broken in two, Martin sent Linton up toward the west end to see what was the cause. Linton walked up to the west end of the east string of cars and saw a break or gap, he testified, of three or four car-lengths. He says he gave the engineer a signal to move easterly to close up the gap, but, upon observing a defective coupler on the west end of the west car of the east string, he stopped him again when the cars attached to the engine on the west were within twenty-five to fifty feet of the east

string of cars. Linton, however, is the only witness who testified that there was more than one movement of the engine after the separation took place. All the other witnesses testified that there was but one movement after the separation, the one in which Lorton met with his fatal injuries.

Linton testified he noticed that the knuckle or lock-pin on the coupler on the west end of the west car of of the east string or cut of cars was defective or inoperative. A king bolt (used ordinarily as a part of another appliance), larger in size and dimensions than the regular lock-pin, was being used in place of the regular lock-pin. According to the testimony, this had the effect of preventing the automatic coupling and uncoupling of the cars. Linton testified it was an impossibility to make a coupling by impact. There is no question on the record but that the coupler was defective. As to how long it had been defective and when the king bolt had been inserted in place of the regular lock-pin, the record is silent. Linton said when he discovered the defective or inoperative coupler he saw Lorton on top of the second head car from the engine. Linton then went east to report to foreman Martin that "we got a bad order knuckle up there we can't couple into; we have got to set it out or shove in." He testified he did not notice any signal given by the foreman after that conversation, but that shortly afterward there was a movement of the train eastward closing up the cut of twenty-five or fifty feet, and that the train moved east eighteen to twenty-two car lengths. His attention was attracted by "hollering—a kind of distress cry." He gave a stop signal, and going west he found Lorton lying on the lead at Number 11 switch, from which Number 12 leads off. It took witness about three seconds to go from where he had been when he heard the distress cry to where Lorton was. He was the first man to reach Lorton, whom he found lying on his back with his feet to the rail, the right foot being crushed and the stomach broken in on the right side.

The engine fireman, Hoops, testified that after the separation took place and the engine with cars attached remained standing, "I got off the engine to go down to Eighteenth Street to get a drink—to go to the fountain there; so I walked down alongside the cut, and Lorton got off at the second or third car—exactly I couldn't tell—he climbed down and we both met on the ground, and me and Lorton walked down along the cars and I seen the cut—the break—just about when Lorton seen it, and I seen it was what we call on the road a jimmied knuckle, and I said to Lorton, 'There is a jimmied knuckle for you,' and he says, 'Yes,' and Lorton walked in and I walked on down to the fountain." The two walked down on the south side of the train and they were about twenty to thirty feet from the broken knuckle when the conversation took place—they saw it with Lorton's lamp, and Lorton walked in to the jimmied knuckle and Hoops went straight east to the fountain to get a drink. After getting a drink, Hoops talked with Bowers, the switch tender, and then "they come shoving down with the whole train, and I says to Bowers, 'He sure did fix that jimmied knuckle in a hurry.' That is all I thought and how any man had that fixed and the train shoved on down." Hoops went to get another drink at the fountain and Bowers then informed him that Lorton was run over, whereupon he ran up to Lorton and found Linton there. When Hoops left Lorton at the break both ends of the cut or break were standing still.

The engineer, Harris, testified that he was sitting on the right or south side of the engine. There had been a break in the train and some eight cars were coupled on to the engine. After the break, upon a signal given him, he stopped the engine. That was when the cars broke in two. When he received the signal and stopped, Lorton was on top of the head box car, a little over half a car-length from the engine. After that, he saw Lorton come down off the box car on the right side and walk on down around the curve until he got out of sight of witness.

Witness thinks the engine stayed there six or seven minutes, when he got a signal by light to come ahead and, in response to the signal, he moved ahead. He did not know where Lorton was—could not see him—did not know who gave the signal. The signal was from somebody way down by the switch. Ordinarily, he was supposed to take the signal from the head man, the purpose being to bring the signal up close to the engineer so there would be no mistake as to signal. He got the signal from a man about eight hundred feet away. The head man was out of his sight, disappearing about eight car-lengths from the engine. Does not know where he went out of sight with reference to where the break occurred. Witness did not know there was a break, but thought there was a break in the cars. Saw Lorton get off the head car and start down in the direction of the break. At that time the cars were standing still. Does not know who gave the signal to proceed—too far away to tell who it was. After he got the signal the train did not move far before there was an impact—would say it moved eight or ten feet. That is the only movement he made before the cars came together. Witness kept getting the slow signal to come ahead and shoved the cars ahead east clear of the lead. He never stopped after receiving the proceed signal, and after he had shoved down a number of carlengths, he got a stop signal and then a back-up signal and then another stop signal, and then discovered Lorton was injured. The last signal he got before the separation of the train was from Lorton on top of the car and when Lorton got down on the ground he kept walking and witness saw him no more. Never got any signal from him after he got down on the ground; never saw him any more.

Martin, the crew foreman, testified he was two carlengths from the extreme east end of the train when the separation or break occurred. Linton was with him and he sent Linton up toward the west end to learn the cause. Linton came back and said there was a defective knuckle,

or coupler, or something of that kind up there—they could not couple on and would have to shove the cut of cars in. Witness then told the switchman, "We will set some brakes on this cut that is broke off and this leading cut push up in the clear of the lead." The idea, as he expressed it, being to switch the cars that are still intact next to the engine, and then handle this broken car with the light engine—get closer to it. He thereupon gave the engineer a signal to come ahead toward the east and the engineer responded to the signal. Witness supposed that was the movement that caught Lorton, because Lorton fell out down there when they commenced slowing up. At the time he gave the signal to the engineer, witness did not know where Lorton was. The last time he saw Lorton, Lorton was on top of the car next to the engine. Did not know Lorton was off the car, his place being to follow the engine, up next to the engine, up on top of the cars. He did not direct Lorton to get off the car and go in between the break, for he did not see him. Lorton fell out on the ground between the cars where this defective coupler was located. He fell out at the switch. The whole engine had passed witness before he heard any noise and Linton had gone up to Lorton first and was with him. Lorton died shortly afterward. Witness did not see Lorton when witness signaled the engineer to shove the cars eastwardly—in fact, he did not look up there to see where Lorton was. The engine moved when he gave the signal and he never saw anybody pass it along. He had been looking up toward the break and was looking west when he started shoving the cut of cars. Did not see any man with a lantern walk down the track toward him. Witness believed he could see a man carrying a lantern after dark for blocks.

Witness Gregg was asked, "Whose duty, as far as the switchmen are concerned, is it to adjust it and inspect what causes the break?" His answer was, "Any

man; the nearest man to it." Gregg stated he did not know who was the nearest man to the break when it occurred.

Witness Linton was asked and answered: "Q. Now, when a separation of the kind that you have described takes place, whose duty is it to make an inspection of the adjustment which caused the separation? A. The nearest man to the separation or whatever the trouble may be. Q. And who was the nearest man at that time? A. Fount Lorton."

A stipulation of the parties was put in evidence and read to the jury reciting that "Fount H. Lorton was at the time and place he was fatally injured, engaged in interstate commerce; that is, commerce between the states, within the intent and meaning of the Federal Employers' Liability Act."

The American Experience Table of Mortality was by agreement read in evidence, showing that at age 34, Lorton's age at time of his death, the life expectancy is 32.5 years, and at age 26, the age of Lorton's widow at time of his death, the life expectancy is 38.12 years. The plaintiff testified that she was appointed administratrix of her deceased husband's estate. That Lorton died on November 20, 1921, leaving two children surviving, Ruth, age four years, and Nellie, age two years, who were born of the marriage between plaintiff and deceased. That deceased was thirty-four years of age and she was twenty-six years of age at the time of his death, and prior thereto deceased's health was perfect and he was able-bodied and strong. His average earnings were $185 per month, of which he retained $35 to cover his personal expenses, and the balance was used by his wife and family.

I. Appellant assigns as error the refusal of its demurrer offered at the close of respondent's evidence. Appellant did not elect to stand upon its demurrer, but

offered evidence in its own behalf.   At the close of its
own evidence, appellant demurred again, and
<span style="float:left">Proximate<br>Cause.</span> assigns as error the action of the trial court
in refusing to charge the jury to return a ver-
dict for appellant.   Where a defendant does not stand
on demurrer at the close of plaintiff's evidence in chief,
but puts in its own case, a final demurrer searches all
the testimony to see if plaintiff's case was not aided by
defendant's proof.   [Stauffer v. Railroad, 243 Mo. 1. c.
316.]   With the foregoing rule in mind, let us see if
respondent made out a case entitling her to a verdict
from the jury.

This suit is primarily based upon an alleged viola-
tion by appellant of Section 2 of the Federal Safety Ap-
pliance Act of March 2, 1893 (Sec. 8606, U. S. Comp.
Stat. 1918) which reads: ''On and after the first day
of January, 1898, it shall be unlawful for any such com-
mon carrier to haul or permit to be hauled or used on
its line any car used in moving interstate traffic not
equipped with couplers coupling automatically by impact,
and which can be uncoupled without the necessity of
men going between the ends of the cars.''

At the outset, appellant contends respondent must
prove a violation of this act by appellant.   The record
clearly shows that the coupler on the west end of the west
car of the east string of thirteen or fourteen cars which
broke loose from the train at the time of separation was
defective.   At some time, undisclosed by the record, a
king bolt had been inserted in place of the regular lock-
pin, which made it impossible to couple the cars auto-
matically by impact.   The record is barren of any evi-
dence to the contrary.   All of the witnesses, with the
possible exception of engineer Harris, testified as to
the defective condition of the coupler and it is appar-
ently undisputed that this had the effect of preventing
the automatic coupling and uncoupling of the cars.   This
proof convicted the appellant of a violation of the
Safety Appliance Act, without further proof of negli-

gence of appellant. [Wolfe v. Payne, 294 Mo. l. c. 184-185.]

Was the defective coupler the proximate cause of deceased's fatal injury? Or perhaps to be more exact, did the violation by appellant of the Safety Appliance Act *contribute* to deceased's injury or death within the meaning of the proviso contained in Section 3 of the Employers' Liability Act of April 22, 1908 (Sec. 8659, U. S. Comp. Stat. 1918), which reads: "Provided, that no such employee who may be injured or killed shall be held to have been guilty of contibutory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees *contributed to* the injury or death of such employee?" In other words, was there any causal connection between the alleged violation of the act by appellant and the injury to respondent's deceased husband? Appellant insists that, under the evidence, these questions must be answered in the negative, and leans upon the decisions of the United States Supreme Court in Railroad Company v. Conarty, 238 U. S. 243; Lang v. Railroad Company, 255 U. S. 455, and Railway Company v. Wiles, 240 U. S. 444.

Without reviewing here in detail the facts in each of the cited cases, it was held in the two first cited cases that, where the person injured was not endeavoring to *handle in any way* the car with the defective appliance, there was no causal connection between the defective appliance and his injury, and hence no recovery could be had for his injury. In the Conarty case, supra, the employee was injured while riding upon the footboard of a switch engine which collided with a loaded freight car, having no coupler or drawbar, left standing on the track. Apparently no one on the switch engine knew that the car was on the track and were bound on another mission entirely unconnected with any handling or movement of the defective car. In the Lang case, supra, the injured employee was on top of a car for the purpose of setting the brakes and stopping a string of cars before they came in contact with a crippled car. It was not the inten-

tion of the crew or the injured employee to disturb, couple onto, or move the crippled car. In the Wiles case, supra, which did not involve a violation of the Safety Appliance Act, the employee was killed because of a violation of certain positive rules of the railroad in evidence, requiring him to flag and stop an on-coming train, which collided with a caboose in which he was riding.

Appellant also cites McCalmont v. Railroad Company, 283 Fed. 736, as authority for its contention. There deceased was a foreman of car inspectors and went in between two cars with a helper to adjust a chain to a car with a defective coupler, left standing on a dead track with other cars awaiting repairs. The rules of the company in evidence required him to set out a signal flag denoting his presence under or between the cars. The helper warned him to set out the flag, but he ignored the warning. He was killed by a collision caused by shunting another car on the track. Held, the proximate cause of the injury was the failure to set out the flag and not the defective coupler. In so ruling, however, the court uses this significant language: "We think the properly logical view of such situations, and the authoritative precedents to be discussed, fairly indicate that such accidents fall into two classes—the one where the impact of the two cars which injures the workman is a part of the movement in which he is purposely participating; the other where this impact is rather a collision which is no part of the plan. In the former class nothing happens which was unintended or which should have been avoided. The presence of the injured person between the cars is the immediate cause of the injury, and that presence was induced by the defective coupling, which is, therefore, in law, the proximate cause. In the other class of cases the unintended and unnecessary collision is the immediate cause of the injury, the presence of the injured person at the danger point is an incident or a condition, and we must therefore look to see whether the defective coupler is the cause of the

collision.  If so, then it is the proximate cause of the injury; otherwise, it is a remote cause.''

In the instant case, the car with the defective coupler was actually in use at the time of the impact.  Prior to the separation of the train, it had been an integral part of the train which the switching crew, of which Lorton was one, was handling.  After the separation was discovered by switchman Linton, he reported the cause to his foreman, Martin, by saying, ''We got a bad order knuckle up there we can't couple into; *we have got to set it out or shove in.*''  The foreman, Martin, confirms Linton's testimony, for he testified that when Linton ''come back he said there was a defective coupler up there . . . they couldn't couple on and we would have to shove the cut of cars in. . . . I told the switchman, 'We will set some brakes on this cut that is broke off and this leading cut *push up* in the clear of the lead.'  The idea being to *switch* the cars that are still intact next to the engine and then *handle* this broken car, you know, with the light engine—get closer to it.  I thereupon give the engineer a signal to *come ahead towards the east.*  He responded to it.''  The engineer, Harris, testified that, when he got the come-ahead signal, ''It was to *hit* the cars; I kept going . . . and *shoved* them out on the lead.''  So it is evident from the testimony of one of respondent's witnesses and two of appellant's own witnesses that the purpose of Martin's signal to the engineer was to push or switch the whole train, including the crippled car, out on the lead and that the impact between the cars which had separated at the break was the result of an intended and accomplished switching movement.

The case here before us is quite similar as to facts to Grand Trunk Western Railway Company v. Lindsay, 201 Fed. 836.  There the injured switchman went between two cars to adjust a defective coupler.  While there was some conflict in the testimony whether he gave a stop signal to the engineer before going between the

cars, or whether he gave a come-ahead signal, the evidence tended to show the movement of the cars was due to the engineer's supposition that a come-ahead signal had been given. The case was submitted to the jury on the issue of whether the defective coupler or the giving of a come-ahead signal by the employee was the proximate cause of his injury, and the Court of Appeals affirmed a judgment of the trial court for plaintiff. On writ of error, the United States Supreme Court held that the proviso to the third section of the Employers' Liability Act, to the effect that no employee injured or killed shall be held guilty of contributory negligence in any case where the violation by the carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee, abolished the defense of contributory negligence for all purposes, and again the judgment below was affirmed. [Railway Company v. Lindsay, 233 U. S. 42.]

Such is the ruling of this court in a recent case involving the Safety Appliance Act. [Wolfe v. Payne, 294 Mo. l. c. 185; affirmed in Davis v. Wolfe, 263 U. S. 239.] In the Wolfe case, the Supreme Court of the United States clearly distinguishes the Conarty and Lang cases, supra, and holds that, as there was substantial evidence tending to show that the defective condition of the appliance was a proximate cause of Wolfe's injury while he was in the discharge of his duty as a conductor, the case was properly submitted to the jury under the act, and quotes with approval this language of that court in Louisville & Nashville Railroad Company v. Layton, 243 U. S. 617: "The language of the acts and the authorities we have cited make it entirely clear that the liability in damages to employees for failure to comply with the law springs from its being made unlawful to use cars not equipped as required—not from the position the employee may be in or the work which he may be doing at the moment when he is injured."

Was it any part of deceased's duties as a switchman on the crew handling the train at the time to go in between the cars and inspect and attempt to adjust or make operative the defective coupler? Appellant says, "No"; respondent answers, "Yes." Switchman Gregg was asked, "Whose duty, as far as the switchmen are concerned, is it to adjust it and inspect what causes the break?" and answered, "*Any man;* the nearest man to it." Switchman Linton testified: "Q. Now, when a separation of the kind that you have described takes place, whose duty is it to make an inspection of the adjustment which caused the separation? A. The nearest man to the separation or whatever the trouble may be."

"Q. And who was the nearest man at that time? A. Fount Lorton." The fireman, Hoops, in relating his conversation with Lorton as they walked down along the train toward the separation or cut, said: "I said to Lorton, 'There is a jimmied knuckle for you,' and he says, 'Yes,' and Lorton walked in." All of this testimony went in without objection from appellant. The evidence shows that when the separation occurred Lorton was on top of either the next car or the second car removed from the engine and that five or six cars remained attached to the engine. (The engineer testified eight cars remained). This would place Lorton within from four to seven cars of the separation. The other switchmen and the foreman were near the east end of the east cut or string of thirteen or fourteen cars. So the evidence tends to show that Lorton was the nearest man to the separation at any time before the impact with the exception of Linton, who, upon direction of the foreman, went up to the break to ascertain the cause and reported back to Martin. There is no proof that Lorton knew that Linton had ever been at the separation or ascertained the cause. Besides, Gregg testified, on cross-examination by appellant, that after the impact which caused Lorton's injury and before he learned

of the injury, he went up to the break at that time and "I was working on the knuckle trying to extract the king bolt; trying to remove that. Q. You were in, then, trying to fix this king bolt? A. Yes, sir." At that time the defective car had been pushed eastwardly to some point near where Gregg had been located. So there is an inference, at least, from Gregg's testimony that he deemed it to be the duty of *"any man"* or *"the nearest man"* to the break to adjust or fix the defective coupler, and this without any command from the foreman so to do. True, Martin, the foreman, says it was Lorton's place "to follow the engine—up next to the engine on top of the cars" and the engineer, Harris, says, "Ordinarily, in the movement of those trains, we are supposed to take the signal from the head man." But neither witness undertook to say that Lorton's sole duty as head man was to remain on top of the cars near the engine for the purpose of passing the signals. Appellant offered no other evidence tending to limit the duties of Lorton to any single act or operation. The testimony of appellant's two witnesses might well be construed as referring to but one of his several duties as head switchman. We think there is sufficient evidence in the record to prove that deceased went in between the cars in the line of his duty as a switchman to inspect and attempt to adjust or make operative the defective coupler.

Appellant's answer does not plead contributory negligence of deceased, but if it did, as to whether Lorton was guilty of such contributory negligence, if any there was, as to prevent respondent's recovery, we are precluded from considering that question by reason of the proviso to Section 3 of the Employers' Liability Act, and the effect given to the proviso by the Federal Supreme Court in Grand Trunk Western Railway Company v. Lindsay, 233 U. S. 42. Neither can we say, upon a consideration of all the evidence in the record, that Lorton's own conduct at the time and under the circumstances in evidence was the sole or proximate cause of his injury.

Does the evidence show that Lorton received his fatal injuries while he was between the separated cars of the train at the place of the defective coupler? We think so. Witness Hoops was the last man who saw him before the injury. He left Lorton at the break or cut in the train. He called Lorton's attention to the "jimmied" knuckle and says Lorton "walked in—went in," apparently for the purpose of attempting to fix or ascertain the cause of the defective coupler. Martin, appellant's own witness, on cross-examination, testified: "Lorton fell out on the ground between the cars where this defective coupler was located." So that, the undisputed proof shows Lorton went in between the cars at the place of the defective coupler and, after the impact caused by shoving the whole train eastwardly, he fell out on the ground between the cars where the defective coupler was located. There is no evidence to the contrary. It is legitimate, when facts are admitted or proved, to draw such reasonable inferences therefrom as will be sufficient to sustain a verdict. [Yarnell v. Railroad Company, 113 Mo. l. c. 580.]

The evidence in the case made a case for the jury and the trial court committed no error in refusing the demurrers offered by appellant at the close of plaintiff's case in chief and at the close of all the evidence.

II. Appellant assigns error in the admission, over the objection of appellant, of incompetent, immaterial and irrelevant evidence offered by respondent. Appellant does not direct our attention to the evidence complained of. Neither does the record disclose any objection by appellant to the admission of any evidence on behalf of respondent. There is no error before us in this assignment and it is, therefore, ruled against appellant.

Irrelevant
Evidence.

III. Appellant complains of error in the giving of plaintiff's instruction numbered one. This instruction

submitted to the jury respondent's theory of recovery. Appellant complains that the instruction exceeds the scope of the evidence and submits to the jury elements of liability not established by the evidence. The particular part of the instruction complained of is that which reads: "and that after said parting or separation of said cars the said Fount H. Lorton, in the line of his duty as a switchman, went in between the ends of the two cars ·where they had separated, if you so find, for the purpose of adjusting or making operative, or attempting to adjust or make operative for coupling such broken, defective or inoperative coupler, if you so find." What we have said in Paragraph I of this opinion disposes of this assignment. There was ample evidence that the coupler was defective and that Lorton in the line of his duty as a switchman went in between the two cars for the purpose of adjusting or making operative, or attempting to do so, the defective coupler. The instruction submitted a proper element of recovery and the assignment is ruled against appellant.

*Instruction: In Line of Duty.*

IV. Appellant assigns as error the giving of plaintiff's instruction numbered two on the measure of damages. That instruction is: "The court instructs the jury that if you find for the plaintiff under the other instructions given you, you will assess her damages in such sum as you may find and believe from the evidence is the present cash value of the future pecuniary benefit, if any, of which the widow is deprived by the death of Fount H. Lorton, and the present cash value of the future pecuniary benefits of which each of the two minor children of the deceased, Fount H. Lorton, are deprived, and until they become twenty-one years of age, respectively, according to the circumstances in evidence, making adequate allowance for the earning power of money, the sum you assess as damages being the aggregate amount of such sums as

*Measure of Damages.*

306 Mo.—10

you may find each of such beneficiaries is deprived, as herein set out.''

Appellant does not dispute that the measure of damages may be arrived at in the way indicated in this instruction, but insists there is no evidence in the record of the ''present cash value of the pecuniary benefits'' of which respondent and her children are deprived, and that there is no standard by which the jury can make ''adequate allowance for the earning power of money.'' The instruction, as to 'its basic elements with respect to the measure of damages in such cases, conforms to the rule laid down in Chesapeake & Ohio Railway Company v. Kelly, 241 U. S. 485, and recognized by this Court in Banc in the recent case of Gill v. Baltimore & Ohio Railroad Company, 302 Mo. 317. In the Gill case, this court said: ''No annuity or present-worth tables were put in evidence. Neither, if they had been, would they have constituted an 'absolute guide of the judgment and conscience of the jury.' [Chesapeake & Ohio Railway v. Kelly, supra.]''

In Vicksburg & Meridian Railroad Company v. Putnam, 118 U. S. 545 (cited by the court in the Kelly case, supra), the trial court had charged the jury that, in arriving at a verdict, they were bound to follow and accept the computations or values shown by certain life and annuity tables in evidence. In holding the charge to be erroneous, the court said: ''In order to assist the jury in making such an estimate, standard life and annuity tables, showing at any age the probable duration of life, and the present value of a life annuity, are competent evidence. . . . But it has never been held that the rules to be derived from such tables or computations must be the absolute guides of the judgment and conscience of the jury. . . . The natural, if not the necessary, effect of these peremptory instructions at the beginning and end of dealing with this matter would be to lead the jury to understand that they must accept the tables as affording the rule for the principal elements of their

Lorton v. Mo. Pac. Ry. Co.

computation; . . . especially, as it was nowhere, throughout the charge, suggested to the jury that they would be at liberty, if they found difficulty in following the mathematical rules prescribed to them, to estimate the loss of income *according to their own judgment.''*

The physical condition of the deceased, his average monthly earnings and earning capacity, together with the respective ages and health of himself, his wife and children at the time of his death, are all in evidence. The mortality tables showing the life expectancies of both deceased and his wife at the time of his death were admitted in evidence by agreement. It was also shown what amount of his average monthly earnings was deducted for his own personal expenses, and that the balance was used by his family. We think there was sufficient evidence upon which to predicate the instruction in question, and that the jury were not misled by the instruction as a guide on the measure of damages. We must assume that they were men of average business experience and intelligence and competent to determine the damage, with the instruction as a guide, according to their own judgment. Besides, the appellant did not see fit to offer any additional evidence bearing upon the subject. Neither did it ask an instruction upon the question it now raises. [Gill v. Railroad Company, 259 S. W. 1. c. 96.] The assignment is ruled against appellant.

V.  Appellant's last assignment of error is that the verdict is excessive, and so excessive as to indicate bias, passion, and prejudice on the part of the jury. The verdict is for $20,000. The evidence shows that Lorton was thirty-four years of age at the time of his death. His health was perfect. He was able-bodied and strong. His earnings averaged $185 per month, of which he allowed himself $35 a month, and the balance, $150 a month, was used by his wife and family. He always handed his pay check to his wife and she paid the family expenses. At the time

Excessive
Verdict.

of his death, his wife was twenty-six years of age, and the ages of the two daughters were four and two years, respectively. Their health is good. The life expectancy of deceased was 32.5 years; that of the wife 38.12 years.

In a recent case, we approved, in Court in Banc, a verdict for $22,333.33, where the deceased was twenty-four years old, but the wife was thirty-two. There were no dependent children. There the average income of deceased was $1800 a year, of which the wife received $1100. [Gill v. Railroad Company, 259 S. W. 93.] In McIntyre v. Railway Company, 286 Mo. 234, the deceased was thirty-eight years of age with an expectancy of twenty-nine years, earning about $120 a month, of which he turned over to the wife $80 or $90 each month. There were no dependent children. Held, a verdict for $16,000 was not excessive. In Crecelius v. Railway Company, 284 Mo. 26, deceased was thirty-four years of age, with a life expectancy of thirty-two years. He left a wife and one child surviving him. His earnings were only $52 per month and the court reduced the verdict from $25,000 to $15,000.

Having in mind the average earnings of the deceased and that his family was receiving at the time of his death an average of $150 per month, or $1800 a year, the ages of deceased and his wife and their life expectancies, and the ages of his two infant daughters, we cannot say that the verdict of $20,000 here is excessive, or that it indicates passion and prejudice on the part of the jury.

We find no reversible error in the record, and the judgment is affirmed. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.