Niva Fernandez, Respondent, v. Mutual Life Insurance Company of Baltimore, a Corporation, Appellant.—78 S. W. (2d) 526.

St. Louis Court of Appeals. Opinion filed February 5, 1935.

*Jones, Hocker, Sullivan, Gladney & Reeder* and *Warren F. Drescher, Jr.,* for appellant.

*Hay & Flanagan* for respondent.

HOSTETTER, P. J.—This suit was instituted on May 11, 1931, in the Circuit Court of the City of St. Louis by the beneficiary under a life insurance policy to recover the sum of $500. The plaintiff is the widow of Gumersindo Fernandez, the insured.

The petition alleged the issuance of a policy by defendant on the 4th day of February, 1928, in consideration of a weekly premium paid to defendant of thirty-four cents, on the life of Gumersindo Fernandez, whereby the defendant agreed to pay to plaintiff the sum of $500 upon receipt of due proof of death of the insured; that the insured died on August 27, 1930, while said policy of insurance was in full force and effect; and that he had complied with all the terms of the policy as required of him and that plaintiff had done likewise since his death; that she had made due demand of the defendant for payment, which had been refused.

The defendant in its answer admitted the issuance of the policy, the death of the insured, the furnishing of due proofs of death, and that, in consideration of the premiums thereon to be paid it agreed, subject to the terms and conditions therein, to pay to plaintiff, the beneficiary, the sum of $500 upon receipt of proof of death of the insured during the continuance of the policy. The answer also admitted that the insured died on or about August 27, 1930, and that at the time of his death all the requirements of the policy had been complied with and all premiums paid and that due proof of death was furnished to defendant by the plaintiff and that the plaintiff had complied with all of the terms and conditions of the contract required of her and that defendant refused to pay the amount of said policy.

For further answer the defendant alleged that said policy was issued in consideration of the statements and representations made by the insured in his written application for said policy, made on the 26th day of January, 1928, by the terms of which contract of insurance the application is made a part thereof, and that in the said application the insured stated and represented, among other things, that he was in sound health; that he had never suffered from any disease; that he had not been treated by any physician at any

time and that there were no physical or mental defects or infirmities existing at the time of the application for said policy; and that said policy contained the following clause:

"Incontestable—This policy will be incontestable after two years except for fraud, misrepresentation of age, or nonpayment of premium."

That said representations so made by the insured in his application for said policy of insurance, were false, fraudulent and untrue, and that at the time of said application, and for a long time prior thereto, the said insured was afflicted with tuberculosis, spondylitis, miliary tuberculosis, and enterocolitis, and that he had been treated therefor in the year 1925 at Barnes Hospital, St. Louis, Missouri, by physicians in attendance at said hospital, and that insured, on the date of the delivery of said policy, was not in good health, and was, at said time, suffering from the diseases above mentioned; that the death of the insured was caused by the diseases above set out, from which he was suffering on the date of the delivery of the policy; that there had been paid to defendant as premiums, $45.90, which, with interest, defendant tendered into court for the use of plaintiff.

Plaintiff's reply was a general denial. The plaintiff's testimony was as follows:

### DIRECT EXAMINATION.

"My name is Niva Fernandez. I am the widow of Gumersindo Fernandez. My husband was 34 years of age when he died on August 27th, 1930, in St. Louis, Missouri. Plaintiff's Exhibit A is a policy of insurance involved in this case, that my husband had on his life. When my husband died I reported his death to the defendant insurance company and made a demand on them for the payment of the policy and also filed proofs of death with them. They did not pay this policy and refused to pay same."

### CROSS-EXAMINATION.

"On January 26th, 1928, when my husband signed the application for this insurance, I was present; his brother was also present, and the agent of the company, whose name I do not remember. I listened to the conversation or questioning that took place while the application was being prepared, but I didn't watch to see what the agent did with reference to the answers, and I didn't see what was written in the answers. I do not remember all the questions the agent asked my husband, but I remember a few of them. My husband signed his name to the application. My husband could not read English. I could not read English very well at that time and cannot read it very well yet. My husband's brother could not read English. None of us tried to read the application, or looked at it. When I was handed the defendant's exhibits just now, I read part of them, but there are words I don't know what they mean. I could not read

one-half as well at the time the application was taken out as I can now.''

## RE-DIRECT EXAMINATION.

''When the application for this insurance was signed by my husband the agent at first tried to get him to buy some more policies, but he didn't want them. He said he had plenty, more than he could pay. Finally the agent convinced him, and he said: 'If you are going to write me a policy just go ahead,' and the agent started asking a lot of questions about his age and who he wanted to leave the money to, and asked if he had ever been to the hospital, and my husband said he had been to the Barnes Hospital. My husband's brother was there at the time. My husband at that time was tall and thin and was hunch backed a little bit, and walked kind of humpbacked. My husband, his brother and I were born in Spain. I don't know how long he had been in this country because I didn't know him when he came here. He could speak English a little, but not much, but he couldn't read nor write English. When the agent filled out the application for this insurance he just wrote on same and then gave it to my husband to sign, and my husband signed it. The agent didn't read it to him. There was no copy of the application attached to the policy (plaintiff's Exhibit A); the policy is now just as it was then. At the time my husband took out this policy of insurance he had another policy with the same company, one that he had taken out about two years before. The company paid that one, and I think I left it at the company. This was a $300.00 policy.''

Plaintiff then offered in evidence the policy of insurance, being No. 5460127, issued by the defendant on February 4, 1928, on the life of Gumersindo Fernandez, in consideration of certain premiums then and thereafter to be paid, wherein it agreed, subject to the terms and conditions therein contained, to pay to Niva Fernandez, as beneficiary under said policy, the sum of $500, upon receipt of proof of death of said Gumersindo Fernandez, during the continuance of said policy.

Alfred Schaap, witness called by defendant, testified that he was connected with the defendant company from 1926 to 1928 or 1929 and was in its employ on January 26, 1928. He continued his testimony as follows:

''Mr. Gumersindo Fernandez was one of my policy-holders for about one and one-half years, and I used to call at his home about every two weeks to collect premiums. He had some policies on some members of his family, but I cannot recollect how many. I secured an application for a policy of insurance from him. Defendant's Exhibit 2 is the application I secured from Mr. Fernandez. I wrote the answers to the questions on the application and got the information contained in the answers from insured, Mr. Fernandez, the de-

ceased. I always ask questions on all applications that I submit for answers, and, naturally, on this one I probably did the same thing. I heard Mrs. Fernandez testify. Neither she nor her husband nor her husband's brother advised me that Mr. Fernandez had been confined to Barnes Hospital previous to the application. No one that I can recall advised me that Mr. Fernandez was at said hospital, or was then or had been suffering from diseases previous to that time for which he had medical attention. There was no information given me by the parties that was not written in the answers contained in the application. Those answers to that application disclose the information truthfully as it was given to me.''

### CROSS-EXAMINATION.

''I had been collecting insurance premiums from Gumersindo Fernandez since August 8, 1927, on a policy issued prior to the one involved in this case, by the defendant, same being a 20-cent premium, policy No. 10032992. The first policy on Mr. Fernandez was issued on December 17, 1921; during the period I collected the premiums on this policy, and later on this new policy, I called at the insured's home every week or every two weeks. However, not all the time did I come in contact with Mr. Fernandez; at different intervals I would collect from Mrs. Fernandez and sometimes from him. I do not know whether or not he was operating a place of business at his residence. In defendant's Exhibit 2, the application for this insurance, in the third to last paragraph on the first sheet, marked 'No. 1,' question: 'Is life proposed now insured in this company, if so, state number and amount of policy,' I wrote the answer 'No.' At the time I wrote that 'No' I had been collecting a 20-cent premium on policy No. 10032992. I wrote this application in a hurry with pencil and I cannot say whether Mr. Fernandez told me that he did or did not have any other insurance with this company. Possibly when I wrote this application I didn't have the book before me and did not take the trouble to get the number of the policy I had been previously collecting on. Anybody is liable to make mistakes. I had been working for the company about one and one-half years before I took this application. I was anxious to write as much insurance as I could, as that was one of my duties. On these small policies of $500 or less the company leaves a good deal to the agent's discretion as to whether the applicant would be acceptable. I would take a look at them and if they looked all right I would recommend that they be accepted. Between August 8, 1927, and February 4, 1928, Mr. Fernandez appeared to me to be a good risk, or else I would have never written him. I cannot recollect whether he was hunchbacked, but he was rather thin. I did not notice any decline in his health after I wrote the application and delivered the policy. I collected for about two years, all told, from August, 1927, to September, 1929, and during

all this time, Mr. Fernandez looked like a healthy man. I do not know who the agent was who wrote the policy of insurance upon which I collected the 20 cents per week. I do not know who the agent was who had been collecting on that book in 1926. I left the defendant company and entered the real estate business, but I am now in the insurance business with the Prudential Life Insurance Company. The defendant company required me to increase my insurance from time to time, and kept requiring me to do it, and if the policy on the weekly business lapsed they would charge me with the lapses.''

### REDIRECT EXAMINATION.

''As far as I can remember there was no physical examination of this applicant on behalf of the company. On the back of defendant's Exhibit 2, marked 'Medical Examiner's Report;' there are written answers. I took care of the medical examiner's report and got the answers to the questions from the insured. I submitted the questions to the insured, had him answer them, and filled out same; then I signed the medical examiner's report. I made no examination with a stethoscope, or anything like that. I had the applicant, Mr. Fernandez, sign that report. He also signed on the reverse side the application for the insurance. When I asked him the question, 'It the life proposed now in sound health?' I stated that to him just as it is.''

### RECROSS-EXAMINATION.

''I do not think that I was mistaken in filling out any of the answers in the medical examiner's report. I cannot explain to the jury why I put the answer 'No' to that question about other insurance. The only reason I can say is that I might not have known he had this other policy when I wrote the insurance and might not have had my collection book in front of me, and it might be entered under a wrong name in my collection book. I cannot say whether the insured gave me that answer. The name Gumersindo in the premium book is just the same as I have it on the application, but I might not have had same in front of me when I wrote the policy. The book that I make entries in does not always tally with the applicant's book, or in the number of the policy. When I delivered this policy I collected an extra 34 cents per week. I should have known that he had another policy, but, according to the application, I didn't report it to the company.''

Dr. F. R. Bradley, a witness called by defendant, testified that he was a physician and assistant superintendent at Barnes Hospital; that according to the records of the hospital the insured, Gumersindo Fernandez, entered the hospital on March 17, 1926, as a semi-private patient of Dr. E. A. Graham, who attended him and Dr. Singer took care of him; that a routine examination was made to determine his

condition and from what he was suffering; that the diagnosis was tuberculosis, chronic, of the lungs and of the tenth and eleventh vertebrae; that he had lymphatitis of the inguinal nodes, and caries of the teeth and pyorrhea; that a plaster jacket was placed on him in order to make his spine rigid; that there was no showing in the record that he ever returned to the hospital again after being discharged on March 23, 1926; that he could not have gone about his business with a cast on; that usually they advised them to go to bed and stay there for a month.

Plaintiff, in rebuttal, called Ben Fernandez, brother of the insured, who testified as follows:

### DIRECT EXAMINATION.

"I am a brother of Gumersindo Fernandez, who had a place of business at 7000 South Broadway. My brother could not read nor write English. I was present at the time the application for the insurance involved in this case was written, same being done at his place of business. The insurance agent asked my brother to get some more insurance. My brother had another policy in the same company and the agent asked him every time a collection was made on the old policy to get some more insurance, and he convinced him that day and they sat there by the table and the agent asked questions that my brother answered. The agent filled out the paper and got my brother to sign it. I can remember some of the questions that were asked. He asked him how old he was; if he was married; if he had any kids, and he said that he had one; how tall he was; if he had ever been sick or in hospital, and he said 'Yes, he was at the Barnes Hospital once,' and he asked who the policy was going to, and he said his wife, and he just turned around and got him to sign it. My brother could read and write Spanish."

### CROSS-EXAMINATION.

"I cannot read English, but that is my brother's signature on defendant's Exhibit 2. I just heard them talking, but I could not see what the agent was writing. I was sitting away from them listening to the conversation, as I used to sit around my brother's soft drink parlor all the time. I can read Spanish. I was not reading the evening paper—Post-Dispatch—when the agent came in. I often read the evening paper, but I was not reading it at that moment. I read both the Post-Dispatch and Star. I can read some of the application, but I cannot understand everything that it means. I can read some. I can't read English correctly. I don't call that English. I didn't examine the application before my brother signed it. I knew at the time that my brother could not read nor write English, and I let him sign that application, knowing that he could not read it. I never advised him. I made no effort to read it for him or tell him what he was signing. I sign without reading. I

have insurance myself; I have a policy, myself. I never did read the application, and never read the one my brother signed.''

The application for the insurance after setting out the full name and residence and occupation and date of birth of applicant, contains the following questions, and answers written thereto:

''2. Is the Life proposed now in sound health? Yes.

''3. State all Diseases of which Life proposed has ever suffered and when? Also names and addresses of all Physicians who ever attended Life proposed and when? None.

''4. Does any physical or mental defect or infirmity exist, or has Life proposed ever suffered from Heart Disease, Cancer, Disease of the Kidney or Liver? State particulars. None.

''5. Has Life proposed or either Parent or any Brother or Sister of Life proposed ever suffered from Consumption? Have you been exposed to it? No.

''6. Name of Person to whom Benefit is to be paid. Niva Fernandez.

''7. Relationship. Wife.

''8. Age next Birthday of Life proposed. 32 years.''

Below these questions and answers in fine print is the following:

''EXCEPTED RISK: The undersigned hereby declares that the answers made above are strictly true; that they shall form the basis and become part of the contract of insurance, and that no contract for insurance is created by reason of this application, until date of actual delivery of the policy to the insured in person, while in sound health; that no death claim shall arise hereunder except after the actual death of the insured, it being understood that in no case shall any disappearance of the insured for any period be construed as actual death within the meaning of this contract. . . .''

Following this is the date, signature of applicant, witnessed by the agent, signature of agent, and then, following that are three questions and the answers written in, as follows:

''1. Is Life proposed now Insured in this Company? No. If so, state numbers and amounts of policies. None.

''2. Is Life proposed now insured in any other Company? If so, what Company, and for what amount? Metropolitan Life, $1000.

''3. Has Life proposed ever been rejected or postponed by this or any other Company? If so by what Company and when? No.''

Following this appears:

''Amt. Coll. on Appl. 34¢. Times 25. Cr. Agent. Schaap. Staff A. District. Mo.''

On the reverse side of the application under the head of ''Medical Examiner's Report,'' the following questions appear in small print with the answers written in:

"1. Full name. Gumersindo Fernandez.

"2. Residence. 7000 S. Broadway Ave.

"3. Personal appearance as to health? Good.

"4. Actual age. 31 years.

"5. Apparent age. 31 years.

"6. Height. 5 ft. 7 in.

"7. Weight 135 lbs.

"8. Race (White or col'd). White.

"9. Is the Heart diseased? If so, state to what extent. No.

"10. Are the lungs diseased? If so, state to what extent. No.

"11. Did you examine the urine? If so, what was the result? No.

"12. Have you any reason to suspect irregular or intemperate habits? No.

"13. Does rupture exist? No. Is proper truss worn? None.

"14. Have you ever been treated at any Sanatorium, Hospital or Dispensary? If so, for what, when and where? No.

"15. Have questions number 3, 4, and 5 on the reverse side been answered correctly? Yes.

"16. Has the party ever been rejected by this or any other Company? If so, state what Company and about when. No.

"17. What is your opinion of the occupation and place of residence? Good."

The reverse side, closes as follows:

"I certify that I have this 26 day of January, 1928, made a personal examination of the above named person, and that the above answers are in my own handwriting, and that the signature of the person examined was written in my presence, and in my opinion is a good risk.

"GUMERSINDO FERNANDEZ,
"Signature of Person Examined.
"ALFRED SCHAAP, Agent.

"February 17, 1896.
"Date of Birth of Person Examined."

At the close of plaintiff's testimony the defendant offered an instruction in the nature of a demurrer to the evidence, which was refused, and again at the close of all the evidence, which was likewise refused.

The following Instruction No. 1, was given by the court at the request of the plaintiff:

"The Court instructs the jury that if you find and believe from the evidence that on the 4th day of February, 1928, the defendant issued to Gumersindo Fernandez the policy of insurance mentioned in the evidence, and if you find that said Gumersindo Fernandez is dead and that the plaintiff, Niva Fernandez, is his widow, and if you find that the defendant has not paid the benefits due under said

policy, and if you find that the plaintiff furnished proof of the death of the said Gumersindo Fernandez, and if you find that the deceased did not fraudulently state and represent to the defendant that he had never been treated by a physician and had never suffered from a disease and was in sound health, and had no physical or mental defects or infirmities existing at the time of the application for said policy, then you are instructed that your verdict should be for the plaintiff and against the defendant.''

The following instruction was given at the request of the defendant:

''The Court instructs the jury that if you find and believe from the evidence that the insured, Gumersindo Fernandez, prior to the 26th day of January, 1928, had been suffering from tuberculosis and treated therefor; that the said Gumersindo Fernandez, on the 26th day of January, 1928, in his written application for the policy of insurance mentioned in the evidence, stated that he had never been treated for any disease, nor by any physician, nor had he ever suffered from consumption, and that the said insured, Gumersindo Fernandez, died on the 27th day of August, 1930, from tuberculosis, then your verdict must be in favor of the defendant and against the plaintiff.''

The jury returned a verdict in favor of the plaintiff for $500 with interest, aggregating the sum of $576.08, and, after an ineffective motion for a new trial, the defendant duly perfected its appeal to this court.

The appellant's main contention is that the trial court should have sustained its demurrer to the evidence. We have set out the testimony in some detail in order that this assignment of error may be fully reviewed.

Appellant contends that, notwithstanding the two year incontestability clause, the insured, having paid premiums on the policy for more than two and one-half years, the defense of fraud urged is still open. This contention of appellant we think is well taken under the authority of Mutual Life Ins. Co. of Baltimore v. Eaves (Mo. App.), 2 S. W. (2d) 193, l. c. 195.

The question as to whether the insured fraudulently made untrue statements in respect to his physical condition and absence of disease and the condition of his health, etc., is a question of fact. In plaintiff's instruction the jury was required, before it could find in favor of the plaintiff, ''to find that deceased did not fraudulently state and represent to the defendant that he had never been treated by a physician and had never suffered from a disease and was in sound health and had no physical or mental defects or infirmities existing at the time of the application for said policy'' and the same issue was embodied in defendant's instruction. So that, under these in-

structions, the jury, before it could return a verdict for plaintiff, was required to find that the insured, at the time the application for the policy was made, did not fraudulently make false representations in order to procure the issuance of the policy. That is a matter of defense urged by the defendant against the validity of the policy and the burden of proving that he did make such false and fraudulent representations at the time the application was made, rests upon the appellant. So that, the issue as to whether the insured did, or did not, make such false and fraudulent representations was clearly a question of fact for the jury and the burden of proving such false and fraudulent representations was, as stated, on the appellant, in order to establish its defense against the validity of the policy.

Appellant seeks to establish the fraudulent falsity of the representations by the fact that the insured signed the application, and, therefore, should be held bound by its contents and by the answers written in by appellant's agent. There is no question but that, if the insured had signed the application with full knowledge of its contents and with full knowledge of the answers which had been written in by the agent as his answers, the burden would have been met by the appellant, because, under those circumstances, the insured would have been held bound by what he signed.

In determining the defendant's demurrer to the evidence, we must be mindful of the oft reiterated rule that for the purpose of ruling on the demurrer, the truth of all the evidence favorable to plaintiff is to be conceded. [Grams v. Novinger (Mo. App.), 231 S. W. 265, l. c. 267.] And further, that plaintiff is entitled to the full force of his own evidence, and of his own testimony, even if contradicted, and to the benefit of all uncontradicted testimony and of all the evidence considered most favorable to him, and is entitled to the benefit of every reasonable inference favorable to his case, which the evidence tends to support. [Grubb v. Curry (Mo. App.), 72 S. W. 863; Williams v. K. C. Southern R. Co., 257 Mo. 87, 165 S. W. 788, 52 L. R. A. (N. S.) 443; Van Raalte v. Graff, 299 Mo. 513, 253 S. W. 220; Peters v. Lusk, 200 Mo. App. 372, 206 S. W. 250.] And, where defendant does not stand on his demurrer, and puts in his own case, then on final demurrer such of defendant's testimony which aids plaintiff's case, may be considered in passing on the demurrer. [Lorton v. Mo. Pac. R. Co., 306 Mo. 125, 267 S. W. 385; Riggs v. Metropolitan St. R. Co., 216 Mo. 304, 115 S. W. 969; Stauffer v. Metropolitan St. R. Co., 243 Mo. 305, l. c. 316, 147 S. W. 1032.]

The agent was anxious to write the policy, and so expressed himself according to the testimony, which we must accept as true in considering the demurrer. We must consider that the insured was a foreigner, born in Spain, and was unable to read or write English; that he, in answer to the agent's questions, told the agent that he had been

sick and had been treated in Barnes Hospital; that the agent asked him a list of questions; that in answer to the question as to whether he was insured in appellant company, the agent wrote the answer "No," which, of course, was a palpable error, because the agent himself knew better because he had been collecting premiums from the insured for several months prior thereto. This answer would, in and of itself, afford the jury information from which they could deduce the fact that the answers so written in by the agent were not the answers actually made by the insured. By reason of the disability of the insured to read English he was put under a handicap and was unable to determine what the questions were, other than as the agent might ask him, and, there being testimony that one of the answers made by the insured to a question was that he had been sick and an inmate of Barnes Hospital, and that answer not being written in by the agent, would, in the mind of the jury, accentuate the lack of value to be attached to the answers which were actually written by the agent. So that, they might reasonably come to the conclusion that the insured answered truthfully to all of the questions propounded him by the agent and by mistake, or otherwise, the agent put in the answers actually found in the application.

It further appeared that the insured had no opportunity, following the signing of the application, to determine what particular questions were contained therein, or what answers were written in, because no copy of the application was attached to his policy. But it is claimed by appellant, that, inasmuch as the insured couldn't read English, he should have, before signing, requested his wife, or his brother, to examine the document he was signing, otherwise he would be bound by it and cites the case of Zeilman v. Central Mutual Insurance Association (Mo. App.), 22 S. W. (2d) 88, l. c. 92. We do not deem this case relied on by appellant as controlling in the instant case.

In the Zeilman case, supra, the plaintiff had signed a full release and received $125 in full settlement of his claim and attempted to avoid the effect thereof by testimony that he was unable to read and that he was told by the defendant's agent that the money was only in part payment of his loss and that, being accompanied by a friend, who could read, the court held that his failure to require the reading of it by the friend was such negligence as would estop him from avoiding it on the ground that he was ignorant of its contents.

This is quite dissimilar to the instant case. According to the testimony, neither the wife nor the brother were able to read English, or, if they had ability to read it at all, they read very imperfectly and could not understand the meaning of lengthy or unusual words.

The burden of proof as to whether the insured made false representations in the application rested upon defendant insurance company. [Albert v. Besel, 88 Mo. 150, l. c. 153; Hazel v. Tipton Bank,

95 Mo. 60, l. c. 65.] The agent soliciting the insurance was the company's agent, not the insured's agent. Section 5733, Revised Statutes of Missouri, 1929 (6 Mo. Stat. Ann., p. 4380), contains the following provision:

" . . . Any person who shall solicit an application for insurance upon the life of another shall, in any controversy between the assured or his beneficiary and the company issuing any policy upon such application, be regarded as the agent of the company and not the agent of the assured, . . ."

It is not within the power of the trial court to direct a verdict in favor of the party on whom rests the burden of proof unless the testimony is admitted to be true, or the proof offered is of such documentary character as to estop the opposite party from denying it. [Jefferson v. German-American Mut. Life Assn., 69 Mo. App. 126.] In view of the fact that the evidence tended to show that insured was unable to read or write English and the insured's wife and brother were largely under the same handicap, and that the agent was anxious to write more insurance, and was, and had been, urging the insured to take out more insurance, and, although he had been collecting premiums from the insured for several months on an older policy, wrote in that insured had no other policy in defendant company and, on the reverse side of the application wrote in his own answer to the question as to insured's personal appearance as to health, that it was "good;" and further, that there is no showing that insured knew that he had the diseases ascribed to him by the examiners during his six days' stay in Barnes Hospital in March, 1926; and that he had all the appearance of acting honestly and in good faith and the absence of any evidence or of any circumstances tending to show that he was in collusion with the agent to defraud the company, these facts and circumstances would authorize the jury to conclude that the insured actually made correct and truthful answers to the questions propounded to him by the agent, which would not be reflected in the answers written in by the agent on account of the latter's mistake, negligence, or, due to the perfunctory manner in which he treated the questionnaire.

We are, therefore, constrained to hold that the plaintiff's case was a submissible one, and that the demurrer was properly overruled. [Andrews v. Bulldog Auto Fire Ins. Assn. of Chicago (Mo. App.), 291 S. W. 508, which was upheld in the Supreme Court in quashing a writ of certiorari in State ex rel., etc, v. Bland, 316 Mo. 559, 291 S. W. 499; Rissler v. American Cent. Ins. Co. of St. Louis, 150 Mo. 366, l. c. 375, 51 S. W. 755, l. c. 757, and cases there cited; La Font v. Home Ins. Co., 193 Mo. App. 543, 182 S. W. 1029, l. c. 1031, and cases there cited.]

The trial court having overruled the defendant's motion for a new trial thereby ruled against defendant as to the weight of the evidence, and we, having no power to interfere with its ruling in that respect, must accept plaintiff's version as to the facts and confine ourselves to the question as to whether the verdict is supported by substantial testimony. [Bank Sav. Life Ins. Co. v. Butler, 38 F. (2d) 972, l. c. 974.]

We hold that the complaints made by appellant as to plaintiff's Instruction No. 1 are without merit. There is nothing in the instruction which required the jury to find for the plaintiff because she is the widow of insured. The reference to plaintiff as the widow is a mere *descriptio personae* and is harmless. Appellant cites no authorities in support of his complaint in this respect.

Neither is there any merit in the complaint against the said instruction on account of its failure to require the jury to find that the insured made a material representation in the application and that appellant was estopped to deny liability because the agent had written incorrect answers, and that the instruction failed to require the jury to find that insured had exercised due care and prudence in affixing his signature to the application. As to the estoppel, it is more a question of law, as to when the principle of estoppel applies, than of fact to be determined by the jury. However, the defendant was permitted to contest the validity of the policy on account of the alleged misrepresentations and has no ground to complain on that score.

We think the question as to whether the insured did, or did not, make false and fraudulent answers in the application was fairly and fully submitted in the instruction given for the plaintiff as well as in the instruction given at the request of the defendant, and the verdict of the jury which was upheld by the trial court is conclusive. Finding no reversible error in the record, it is ordered that the judgment of the trial court be, and the same is, affirmed. *Becker* and *McCullen, JJ.*, concur.